UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


JOHN A. MULLINS                                                                    PLAINTIFF

v.                                                        CIVIL ACTION NO. 3:09-CV-371-S

PRUDENTIAL INSURANCE COMPANY
OF AMERICA, et al.                                                            DEFENDANTS

## ORDER

          This order considers two motions. Both motions arise from a discovery dispute

that involves an Employee Retirement Income Security Act of 1974 (ERISA) claim.  *See* 29

U.S.C. §1001, *et seq*. (DN 43, 46).  The claim is brought by Plaintiff John A. Mullins, a former

employee of Gordon Food Services (GFS).  GFS maintains its own employee disability benefit

plan, known as the GFS Division Voluntary Employee Benefit Plan (GFS Plan).  Mullins has

sued the GFS Plan and the Prudential Insurance Company of America (Prudential) for their

refusal to provide him with further long-term disability (LTD) benefits due to his osteoarthritis

and degenerative disc disease in his cervical and lumbar spine.

          The GFS Plan paid Mullins disability benefits for a year, then his disability claim

was filed with Prudential, the insurer for the GFS Plan. Prudential paid Mullins retroactive LTD

benefits for two years, but then determined that his condition, and its attendant limitations, did

not meet Prudential's definition of long term disability, an "any occupation" definition broader

than the "similar occupation" definition found in the GFS Plan.  Mullins, who by that time had

been separately determined to be disabled for the same condition by the Social Security

Administration, proceeded to bring suit against the GFS Plan and Prudential in federal court

alleging, among other claims, that both had violated their fiduciary duties arising under ERISA,

29 U.S.C. § 1132.

After filing suit, Mullins served Prudential and the GFS Plan with interrogatories and requests for production of documents. Prudential responded to these discovery requests and supplemented its response. Mullins now maintains that the information provided by Prudential falls far short of what he is entitled to receive under *Metropolitan Life Ins. Co. v. Glenn*, __U.S. __, 128 S. Ct. 2343 (2008), given the existence of a *per se* conflict of interest arising from Prudential's dual status as an ERISA plan administrator, who determines eligibility for benefits, and a payor who pays such benefits from its own pocket. *Glenn*, 128 S. Ct. at 2346.

Mullins insists in his motion to compel that he is entitled to full discovery, beyond the contents of the administrative record, to explore this inherent conflict of interest and the resulting bias. He supports this view with citation to a number of recent Kentucky district court decisions that discuss the impact of *Glenn* on the prior status of discovery established in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). *See, Kinsler v. Lincoln Nat. Life Ins. Co.*, 660 F. Supp.2d 830, 832-836 (M.D. Tenn. 2009); *McQueen v. Life Ins. Co. of North America*, 595 F. Supp.2d 752, 754-56 (E.D. Ky. 2009); *Thornton v. Western and Southern Life Ins. Co. Flexible Benefits Plan*, Case No. 3:08-CV-00648-M, 2010 WL 411119 (W.D. Ky. Jan. 28, 2010); *Raney v. Life Ins. Co. of North America*, 2009 WL 1044891 (E.D. Ky. Apr. 20, 2009); *Johnson v. Conn. Gen. Life Ins. Co.*, 324 Fed. Appx. 359, 365-67 (6th Cir. Apr. 7, 2009); *Pemberton v. Reliance Standard Life Ins. Co.*, __ Fed. Supp.2d __, 2009 WL 89696 (E.D. Ky. Jan. 13, 2009).

The GFS Plan, in response to the discovery served by Mullins, has filed a separate motion for a protective order (DN 43). In this related motion, the plan seeks to preclude Mullins

from taking discovery beyond the administrative record already provided to him. The plan also maintains that because it has fully paid Mullins all of the disability benefits available to him under its self-insured, one-year benefits plan, no possible basis for recovery against it remains under ERISA.

**Background Facts**

Plaintiff John Mullins is a former employee of Gordon Food Service (GFS). Mullins began work for GFS in the early 1990s and continued to work for the company as a customer development specialist until early October of 2005, when he took a FMLA leave of absence due to pain-related limitations arising from arthritic degenerative disc disease in his cervical and lumbar spine (DN 28, Administrative Record, GFS 225-229). Magnetic resonance imaging of Mullins' cervical spine confirmed the presence of moderate to severe spondylosis at the C3-C4 and C6-C7 vertebrae accompanied by degenerative osteoarthritic changes including narrowing of the spinal canal, along with the presence of a bulging cervical disc (DN 28, Admin. Rec. GFS 285-287). Mullins' job duties with GFS in 2005 required him to travel extensively in a designated sales territory to deliver GFS food products to commercial customers and solicit additional orders of GFS products (*Id*. at GFS 230). These duties, according to Mullins, would occasionally require him to lift and carry food products that weighed between 25 and 100 lbs.

Soon after taking leave from GFS, Mullins moved from his home in Rowan County, Kentucky, to Ocala, Florida near Gainesville where he sought treatment for his back and arm pain. Mullins began treatment with Dr. Gabrielle Umana and her physician's assistant, Mukti Patel, at the Family Care Specialists Center in Ocala (*Id*. at GFS 290-296). Dr. Umana provided Mullins with a number of medical excuse slips advising GFS that Mullins remained

unable to return to work. Mullins underwent weekly physical therapy at TLC Rehabilitation in late January through March of 2006 (DN 27, Admin. Rec. D138, D210-249). That January, he also sought pain management treatment from Dr. Mangala Shetty of Marion Pain Management (*Id*. D88). Mullins apparently was evaluated for possible orthopedic surgery to relieve his symptoms, but declined surgical intervention to pursue more conservative treatment.

In May of 2006, after learning of Mullins' relocation to Florida, GFS notified him that if he did not contact the company within 30 days he would be terminated from employment given the absence of any expected return to work date and his relocation to Ocala (DN 27, GFS 256). The following month, on June 1, 2006, GFS terminated Mullins' employment. Mullins, who was then receiving LTD benefits from GFS, was provided with a voluntary LTD benefits application for Prudential's plan in mid-July of 2006. He completed and submitted the application that August (*Id*. at GFS 233). Prudential initially denied his claim based on incomplete medical information (*Id*.). Mullins appealed with the assistance of his prior counsel and on March 12, 2008, was awarded 24-months of LTD benefits beginning October of 2006 (*Id*.).

During this time, Mullins had pending before the Social Security Administration an application for disability insurance benefits which he filed on October 20, 2005, based on his degenerative osteoarthritis, degenerative disc disease of the cervical and lumbar spine, obesity and diabetes mellitus (DN 28, Admin. Rec. D0092-97). Following a hearing before Administrative Law Judge James Quinlivin, the SSA found Mullins to be disabled as of October 4, 2005 from all substantial gainful activity due to his medical conditions (*Id*. at D0097). In reaching this result, the ALJ considered Mullins' medical history, including the diagnostic

imaging of his spine, the resulting exertional limitations in his ability to perform work-related tasks, his past relevant work history, his age, education and the opinion of a vocational expert who testified, based upon all of the above factors, that no jobs existed in the national economy that an individual with Mullins' limitations would remain capable of performing. (*Id*. at D0096-97).

Despite the conclusion of the SSA and the opinions of various treating physicians that Mullins is totally disabled, Prudential terminated Mullins' long-term disability benefits effective October 4, 2008. In so doing, Prudential relied upon the opinions of a vocational rehabilitation expert, Sue Howard, and the medical opinions of two physicians employed by MES Solutions, Dr. Albert Fuchs, a doctor of internal medicine (*Id*. at D153-161) and Dr. Leela Rangaswamy, a board certified orthopedic surgeon. Howard indicated in her employability assessment report of April 2008, that Mullins remains capable of performing alternative work in the positions of sales representative for wholesale and manufacturing, food products or other companies (*Id*. at D114-119). Doctors Fuchs and Rangaswamy determined that Mullins has no functional impairments from October 5, 2008, forward that would impose any physical limitations on his ability to perform the demands of gainful employment.

Mullins took an administrative appeal of Prudential's decision to terminate his LTD benefits (*Id*. at D132-143). In his appeal, Mullins argued that his treating physicians, and Dr. Frederick Huffnagle, a physician who reviewed Mullins' medical records, uniformly concluded that he suffered with significant orthopedic limitations that severely impacted his ability to sit and stand for extended periods of time. Mullins pointed out that Dr. Jose L. Roman had determined that he was not able to adequately function in a work environment even at a

sedentary exertional level, as did SSA ALJ Quinlivin (*Id.* at D138). Mullins argued that the combined effect of his various pain medications further limited his cognitive abilities, as did the physical capacity evaluation from Ocala Rehabilitation Associates, which performed a physical capacity evaluation in September of 2008, and concluded that Mullins is not capable of performing a stationary job that includes extended periods of sitting or standing (*Id.* at D141). These opinions notwithstanding, Prudential declined to alter its decision that Mullins' condition does not satisfy its contractual definition of disability, which requires in effect that the claimant be precluded from all substantial gainful activity, rather than merely the performance of his past relevant work. Accordingly, Mullins filed the present action.

## LEGAL ARGUMENTS

Prudential argues in its response that the true focus of the present lawsuit falls on the question of whether it acted arbitrarily and capriciously when it denied Mullins' LTD claim under the "any occupation" definition of disability found in the terms of its plan (DN 56). The answer to this question Prudential asserts is found within the administrative record, which it has fully provided to Mullins along with all of the responsive discovery to which he is entitled. Prudential insists that Mullins has now set out upon a fishing expedition that, far from determining the possibility of alleged bias, is actually intended to substantially increase its litigation costs in violation of the principle that ERISA disability-related proceedings are intended to be both expeditious and inexpensive in their resolution.

Prudential disputes Mullins' broad reading of *Glenn*, and maintains that the fundamental principles of the *Wilkins* decision remain in place so that even post-*Glenn*

discovery, if permitted, remains limited and dependent upon a colorable showing of bias that Mullins has yet to make. Further, Prudential insists that even if Mullins is entitled to discovery beyond the administrative record, Prudential has provided him with all of the relevant answers and documents he sought except for those items which clearly remain undiscoverable, *Glenn* notwithstanding.

Many of these same arguments are raised by the GFS Plan in its separate motion for protective order(DN 43). The plan, like Prudential, also insists that *Glenn* does not directly address the question of discovery in ERISA cases. Further, post-*Glenn* decisions from the Sixth Circuit, according to the GFS Plan, continue to hold that discovery is not automatically available absent a colorable procedural challenge. *See, Johnson v. Conn. Gen. Life Ins. Co.*, 324 Fed. Appx. 459, 465-67 (6th Cir., Apr. 7, 2009). Even in those decisions which permit discovery, the plan argues that such discovery remains limited to the narrow topic of the alleged conflict of interest. *See, Pemberton v. Reliance Standard Ins. Co.*, __ Fed. Supp.2d __, 2009 WL 89696 at *2-3 (E.D. Ky. Jan. 13, 2009).

The GFS Plan insists that no colorable due process violation or inherent conflict of interest exists as far as it is concerned because after one year on disability under the self-insured plan of GFS, its own obligation to make payments ceased and Prudential assumed responsibility for any further LTD benefits under the voluntary LTD benefit plan in place. In other words, GFS argues that it paid out all of the disability benefits to Mullins that were due him so that it extinguished its obligation under the self-insured plan. Accordingly, no procedural irregularity or inherent conflict of interest, the sole basis for the *Glenn* decision, remained. Alternatively, GFS argues that even if Mullins is entitled to some discovery, he clearly is not

entitled to any discovery involving employee personnel files, performance reviews, disciplinary action or board certifications and professional backgrounds of reviewers. *See, Thornton v. Western and Southern Life Ins. Co.*, 2010 WL 411119 at *3 (W.D. Ky. Jan. 28, 2010).

Mullins has filed his own response to the plan's motion for a protective order (DN 65). Mullins counters in his response that his claim for LTD benefits arises from and is payable from the GFS Plan, which he notes contains a definition of disability more limited in its scope than that definition now relied upon by Prudential to deny him LTD benefits. Mullins reasons that if the Court determines that he is entitled to LTD benefits, then "the GFS Plan will be financially liable going forward ...[and] [a]s a result, the GFS Plan's financial conflict of interest is inherent - - meriting discovery." (DN 65, p. 3). Nevertheless, despite the GFS inherent conflict of interest, Mullins advises the Court that he will be "satisfied with limiting discovery to the GFS Plan's past practice with enforcing its alleged reimbursement provision." (DN 65, p. 5). GFS has filed a reply which the Court has considered (DN 70).

## Legal Analysis

The question of discovery in ERISA litigation has generated substantial conflict in the federal courts both before and after the recent Supreme Court decision in *Metro Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S. Ct. 2343 (2008). *See* R. Alberts, J. Ghozland & M. Steinhardt, *Circuits at Odds A Year After Glenn— No Clear Path*, 51 No. 9 DRA 33 (Sept. 2009). Prior to *Glenn,* the Sixth Circuit judicial benchmark for discovery in ERISA cases was set by *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). *Wilkins* provides that district court review of an ERISA claim for denial of benefits is confined to the administrative record with limited exceptions. *See, Thornton v. Western and Southern Life Ins.*

*Co.* at 2010 WL 411119 at *1. The thought behind this particular approach is to promote a policy that disputes over the payment of benefits should be resolved as inexpensively and expeditiously as possible. *Perry v. Simplicity Engineering*, 900 F.2d 963, 967 (6th Cir. 2000). Extensive discovery was felt to be contrary to such a policy and to the intent of Congress as well. *Id.* Accordingly, regardless of whether the federal courts of the circuit applied the *de novo* standard of review or an arbitrary and capricious standard, the general rule of *Wilkins* regarding discovery remained that the district courts were to focus on the administrative record and would only venture outside the record in those few instances in which an ERISA claimant satisfactorily alleged a violation of due process or bias by the administrator. *See, Kinsler v. Lincoln Nat. Life Ins. Co.*, 660 F. Supp.2d at 831-32 (citing *Miller v. Metro Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)).

      *Wilkins* did not close the door, however, to judicial review of matters outside the administrative record. The decision cannot be read to prohibit discovery in ERISA cases. Rather, the focus after *Wilkins* shifted to judicially crafting an understanding of the prerequisites for "a limited foray into evidence outside the administrative record...." *Thornton*, 210 WL 411119 at *1. The essential question became what must a plaintiff in an ERISA show in order to embark upon such a foray. Two schools of thought developed in the Sixth Circuit. *See, Kinsler v. Lincoln Nat. Life Ins. Co.*, 660 F. Supp.2d at 832-34 (discussing in depth the two competing lines of case law); *Bird v. GPX, Inc.*, 2009 WL 3839478 at *2 nn 1, 2 (W.D. Tenn. Nov. 13, 2009) (collecting case law from each line of authority).

      One line of case law, the "initial threshold showing" line of authority, requires an ERISA plaintiff who seeks discovery to do more than merely allege the existence of a procedural

irregularity, a due process violation or the existence of bias in order to be entitled to discovery. This line of cases began with an unpublished decision, *Putney v. Medical Mut. of Ohio*, 111 Fed. Appx. 803 (6th Cir. 2004). Included in the initial threshold showing line of cases are a number of unpublished decisions such as *Huffaker v. Metropolitan Life Ins. Co.*, 271 Fed. Appx. 493, 540 (6th Cir. 2008); *Bradford v. Metro Life Ins. Co.*, Case No. 3:05CV-240, 2006 WL 1006578 at *3-4 (E.D. Tenn. Apr. 14, 2006); *Ray v. Group Long Term Disability Policy*, Case No. 2:06CV-460, 2007 WL 127984 (S.D. Ohio, Jan. 11, 2007); and *McInerney v. Liberty Life Assur. Co. of Boston*, Case No. 60-2681-MaV, 2007 WL 1650498 at *2-4 (W.D. Tenn. June 4, 2007). These decisions hold that the ERISA plaintiff who seeks discovery must justify his request with a colorable showing of the existence of the alleged procedural irregularity or bias. *Huffaker*, 271 Fed. Appx. at 504 ("[a] plaintiff cannot obtain discovery beyond the administrative record - - even if limited to a procedural challenge - - merely by alleging a procedural violation.").

In competition with the initial threshold case line of cases is a second series of cases referred to as the "mere allegation" cases. This line of authority began with the published decision in *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005) and continued with *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) and *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416 (6th Cir. 2006). All three of the decisions, *Calvert, Kalish* and *Moore*, hold that discovery in ERISA litigation over the denial of a claim for benefits does not depend upon the claimant making an initial threshold showing of a lack of due process or bias. Rather, in the view of these courts, an allegation of a due process violation or lack of bias is itself sufficient to permit the ERISA claimant to obtain discovery into the nature of the alleged bias or due process violation. *Kinsler*, 660 F. Supp.2d at 833-34.

This second line of authority, much like the unpublished initial threshold cases, suffered from its own limitation.  In none of the three cases did the plaintiffs actually attempt to take discovery so that the published opinions in *Calvert, Kalish and Moore* appear to be dicta to the extent that the Sixth Circuit panels involved expressed the view that no threshold or colorable showing of a due process violation or bias is required to entitle an ERISA plaintiff to discovery.  To this extent, the second line of case authority is no more clear precedent than the unpublished decisions of the first line of case authority.  The situation remained unresolved until *Glenn* with "[t]he courts caught between two compelling interests - - limited judicial review as a means of resolving benefit disputes inexpensively and expeditiously, *Perry*, 900 F.2d at 967 ... and the promotion of 'interest of employees and their beneficiaries in employer benefit plans and to protect their contractually defined benefits.'" *Bird*, 2009 WL 3839478 at *2 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)).

In 2008, matters changed dramatically concerning these compelling interests with the Supreme Court decision announced in *Metropolitan Life Ins. Co. v. Glenn*, ___U.S.___, 128 S. Ct. 2343 (2008).  In *Glenn*, the Supreme Court faced the question of "whether a plan administrator that both evaluates and pays claims operates under a conflict of interest in making discretionary benefit determinations" and "how such conflict should be taken into account on judicial review of a discretionary benefit determination."  *Glenn*, 128 S. Ct. at 2347.  The Supreme Court in resolving this question concluded that this dual role of administrator/payor creates a *per se* conflict of interest that the district court should weigh as a factor.  The court in *Glenn* then continued to observe that this *per se* conflict of interest does not require that the courts "create special burden-of-proof rules, or other special procedural or evidentiary rules,

focused narrowly upon the evaluator/payor conflict" as such "special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress." *Glenn*, 128 S. Ct. at 2351. Thus, *Glenn*, while not speaking directly to the scope of discovery, strongly implies in its decision that some discovery is available to ERISA plaintiffs to the extent that such plaintiffs find themselves faced with such a *per se* conflict of interest.[1]

A number of recent district court decisions from both the Western and Eastern Districts of Kentucky, as well as Tennessee, have now concluded that *Glenn* has liberalized discovery to a degree. ERISA plaintiffs may look beyond the administrative record to explore the existence and impact of the inherent conflict of interest to determine whether such conflict affected the benefits decision of the defendant plan administrator/payor. *See, Thornton*, 2010 WL 411119 at *2 ("Since *Glenn*, many district courts within the Sixth Circuit have determined that discovery beyond the administrative record is appropriate to assist the court in determining whether an inherent conflict of interest gave rise to an actual abuse of discretion.") (collecting

---

[1] In *Pemberton*, 2009 WL 89696 at * 2 the District Court for the Eastern District of Kentucky insightfully explains *Glenn* and its impact as follows:

> While the defendant correctly states that *Glenn* does not mention discovery, it incorrectly contends that *Glenn* does not have a impact on the rules of discovery in ERISA matters. Even though the Supreme Court did not expressly alter the rules of discovery in an ERISA conflict-of-interest case, they effectively did so by recognizing the inherent conflict and requiring courts to consider it as a factor when deciding whether the plan administrator abused its discretion. Without discovery plaintiffs would be severely hindered in their ability to obtain evidence to show the significance of the conflict of interest. Therefore, it is logical to assume that the Supreme Court meant for lower courts to allow some discovery beyond the administrative record when a conflict of interest is present.

*Id.*

cases); *Bird*, 2009 WL 3839478 at *2 ("The practical implication of this holding [in *Glenn*] is to resolve the 'threshold or no threshold' debate in favor of the ERISA plaintiff ... [so that when] a conflict of interest exists ... limited discovery as to the conflict is warranted."); *McQueen,* 595 F. Supp.2d at 754 ("[U]nder *Glenn*, the dual role creates a conflict of interest, and the presence of that conflict of interest, on its own, is sufficient to permit a court to allow discovery beyond the administrative record."); *Hayes v. Provident Life and Acc. Ins. Co.*, 623 F. Supp.2d 840, 843 (E.D. Ky. 2008) ("This court is persuaded that, after *Glenn*, some discovery is appropriate in ERISA denial of benefits cases involving a conflict of interest. As the *Winterbauer* court stated, '[T]here is no way to determine the extent of the administrator's conflict of interest without looking beyond the administrative record.'") (citing *Winterbauer v. Life Ins. Co. of North Amer.*, 2008 WL 4643942 at *4-5 (E.D. Mo., Oct. 20, 2008)).

   The above decisions uniformly recognize the transformational impact of *Glenn* on the availability of discovery in ERISA actions that involve claims arising from the denial of benefits. The full extent of the transformation, however, remains to be determined with various courts left to flesh out the scope of discovery. *Bird*, 2009 WL 3839478 at *3 ("The task left to the lower courts to resolve [after *Glenn*] is shaping the contours of the limited discovery."). What is determined by *Glenn* is that the threshold showing requirement in the first line of cases discussed above, *Putney, Liks, Huffaker, Bradford, Ray* and *McInerney* has now been put to rest. The mere existence of an inherent conflict of interest that arises when the same entity is both plan administrator and benefits payor is itself the "threshold ." ERISA plaintiffs need do no more than show the existence of such inherent conflict in order to obtain discovery. As *Kinsler* succinctly explains:

The rulings in *Wilkins, Moore* and *Glenn* compel the result that discovery into this alleged conflict of interest is proper, even if the plaintiff has not made an initial threshold showing of bias beyond alleging the existence of this type of conflict of interest.

*Kinsler*, 660 F. Supp.2d at 836.

What remains to be established is the scope of discovery that an ERISA plaintiff may obtain in order to establish the extent of the impact that such an inherent conflict of interest may have had upon the decision to deny his or her claim to benefits. Discovery must be broad enough to allow the benefits claimant to show to the court how the inherent conflict specifically affected the benefits determination in his or her case. Without adequate discovery, as *Kinsler* notes, as ERISA plaintiff will be "handcuffed" in his or her ability to adequately explore what may be a critical issue to the just outcome of the action. Although Prudential may decry such discovery as being a "mere fishing expedition," the district court in *Hays* incitefully offers the observation that "'much of discovery is a fishing expedition of sorts, but the Federal Rules of Civil Procedure allow the courts to determine the pond, the type of lure, and how long the parties can leave their lines in the water.'" *Hays*, 623 F. Supp.2d at 844 (citing *Myers v. Prudential Ins. Co. of Amer.*, 581 F. Supp.2d 904, 913 (E.D. Tenn. 2008)).

In fact, many of the post-*Glenn* decisions cited above have done just that - - established a clear range of both permissible and impermissible subjects for discovery by an ERISA plaintiff faced with an inherent conflict of interest such as that in *Glenn*. For example, in *Hays*, the district court identified the kinds of information discoverable, which included: the history of the claims administration; any steps taken by the defendant plan administrator to reduce potential bias or promote accuracy; and the financial incentives, bonus or reward system, formal or informal, for those employees who were involved in any meaningful fashion in

determining the outcome of the plaintiff's disability claims. *Hays*, 623 F. Supp.2d at 844 (citing *Myers*, 581 F. Supp.2d at 915).

Likewise, in *Raney*, a decision that characterized the scope of this discovery as being "narrow," the district court nevertheless identified the same factors as those earlier set out in *Hays* - - a history of bias claimed denials, steps taken to reduce potential bias, and company policies, formal or informal, that reward claim denials. *Raney*, 2009 WL 1044891 at *3 (citing *McQueen*, 595 F. Supp.2d at 755-56). The district court in *Pemberton* also permitted discovery to "include statistical information about the outcome of claims submitted to reviewers...." *Pemberton*, 2009 WL 89686 at *3.

In those situations in which the same plan administrator relied upon third-party reviewers whose opinions or reports may have been unduly influenced by financial incentives, the courts have permitted ERISA plaintiffs similarly situated to Mullins to explore the compensation arrangements between the plan administrator and such third-party reviewers. Discovery may include contractual connections, annual financial payments and statistical data about the number of claims sent to the same reviewers and the number of denials resulting therefrom. *Id*. *Pemberton* additionally permits an ERISA plaintiff to obtain statistical data on the number of times that such reviewers found disability claimants able to work at a sedentary occupational or found the claimants to be not disabled from any occupation. *Id*. In fact, *Pemberton* permitted the plaintiff therein to "look back" over the history of claims administration for a period of 10 years prior to the final denial of his own disability claim. The same subject areas for discovery are recognized in the *McQueen* decision, as well. *McQueen*, 595 F. Supp.2d at 755-56.

These so-called "permitted areas of inquiry" are neatly laid out in *Bird*, which contains a bullet point list of the topics on which discovery related to an inherent conflict of interest may be had by an ERISA plaintiff. These topics, or areas of inquiry, are much the same as those set forth above in *McQueen, Pemberton, Raney* and *Hays*.[2] They include:

- "incentive, bonus or reward programs or systems, formal or informal, for any employee(s) involved in any meaningful way in reviewing disability claims" *Myers,* 581 F. Supp. 2d at 914

- "contractual connections between [plan administrator/payor] . . . and the reviewers utilized in plaintiff's claim . . . and financial payments paid annually to the reviewers from the . . . [administrator/payor]" *Pemberton,* 2009 WL 89696 at *3

- "statistical data regarding the number of claims files sent to the reviewers and the number of denials which resulted" *Id.*

- "number of times the reviewers found claimants able to work in at least a sedentary occupation or found that claimants were not disabled" *Id.*

- "documentation of administrative processes designed only to check the accuracy of grants of claims (limited to claims guidelines actually consulted to adjudicate plaintiff's claim).

*Byrd,* 2009 WL 3839478 at *3.

*Thornton*, much like the other decisions including *Byrd*, also identifies the general categories of information that fall outside the acceptable range of post-*Glenn* inquiry. As *Thornton* notes, "Courts typically refuse to permit discovery into areas falling under the general category of 'reviewer credibility.'" *Thornton*, 20120 WL 411119 at *3. These areas ordinarily encompass information such as employee pay records and personnel files. *Hays*, 623 F. Supp.2d

---

[2]All of these areas also are succinctly listed in the recent decision of our fellow magistrate judge announced in *Thornton*. *Thornton*, 2010 WL 411119 at *3.

at 845 (citing *Myers*, 581 F. Supp.2d at 915). Also normally excluded from discovery are matters that involve the professional backgrounds of reviewers such as "whether reviewers faced criminal charges, civil suits, or disciplinary action, failure to be come board-certified, or the history of patient treatment by medical reviewers. *Raney*, 2009 WL 1044891 at *3 ("These credibility-type requests are unlikely to lead to evidence of any claim of bias or conflict of interest.") (citing *Pemberton*, 2009 WL 89696 at*4) ("Because information regarding the training and qualifications of the reviewers is unlikely to lead to evidence concerning either the conflict of interest or bias, the plaintiff is not entitled to discovery on these issues."). *See also, Bird*, 2009 WL 8389478 at *3 (improper areas of inquiry include: personnel files, performance reviews and pay records of insurers' employees; and information regarding training and qualifications of reviewers). With these two sets of guidelines in mind, the Court now turns its focus to the individual discovery requests put at issue by Mullins' motion.

### 1. Interrogatories.

Mullins in interrogatory no. 2 seeks to obtain from Prudential the factual basis for defenses no. 2 through 9 set forth in Prudential's answer. Prudential objects in response and advises the Plaintiff that its defenses are "govern[ed] [by] ERISA law and/or ... the terms of the plan documents/LTD policy at issue, which are readily identifiable by reviewing the plan documents produced under seal by Prudential in this matter, to which Prudential refers Plaintiff pursuant to Fed.R.Civ.P. 33(d)." (Document no. 46, p. 2). In other words, Prudential relies on the business records option of Rule 33(d) to generally respond to the Plaintiff's interrogatory.

Prudential's general reference to Rule 33(d) is insufficient. Rule 33(d) applies

only in those instances in which the information sought may be obtained by the examination of the opposing party's business records, and the burden of obtaining such responsive information is substantially the same for either party.  Fed.R.Civ.P. 33(d).  If both of these preconditions are satisfied, then the responding party may answer, but must do so by specifically identifying the records in sufficient detail to permit the requesting party to locate and identify them as easily as the responding party itself could.  *Id.  See, United States, ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 680-81 (E.D. Cal. 2006) ("Generally, if the information sought is contained in the responding party's files and records, he or she is under a duty to search the records to provide the answers ... But where information is contained in business records and answering the question would require the responding party to engage in burdensome or expensive research, the responding party may answer by specifying the records from which the answer may be obtained and making them available for inspection by the party seeking discovery.") (citations omitted).

Rule 33(d) is not intended to be used as "a procedural device for avoiding the duty to give information."  *In re Johnson*, 408 B.R. 115, 122 n.3 (Bankr. S. D. Ohio 2009).  In other words, "The responding party may not avoid answers by imposing on the interrogating party a mass of business records from which answers cannot be ascertained by a person unfamiliar with them."  *In re GI Holdings, Inc.*, 218 F.R.D. 428, 438 (D. N.J. 2003).  A party who seeks to rely upon the Rule must not only certify that the answer may be found in the records referenced by it, but also "must specify where in the records the answers [can] be found."  *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313, 322-23 (C.D. Cal. 2004) (citing *Rainbow Pioneer No. 44-18-04-A v. Hawaii-Nevada Investment Corp.*, 711 F.2d 902, 906 (9th Cir. 1983).  A party that attempts to rely upon Rule 33(d) with a mere general

reference to a mass of documents or records has not adequately responded. *Hypertherm, Inc. v. American Torch Tip Co.*, 2008 WL 5423833 at *3 (D. N.H. 2008). *See also, Dunkin Donuts, Inc. v. N.A.S.T., Inc.*, 428 F. Supp.2d 761, 770 (N.D. Ill. 2005) (reference to documents in the possession of the requesting party and documents produced in this case held insufficient to meet the requirements of the Rule); *In re Sulphuric Acid Antitrust Litigation*, 231 F.R.D. 320, 325-26 (N.D. Ill. 2005) ("[T]here must be a sufficiently detailed specification of the records to permit the interrogating party to find the document as readily as can the party served. These are not optional requirements ...[R]eferring to business records en masse, without specifying particular documents is 'an abuse of the option.'") (citing *Bonds v. Dist. of Columbia*, 93 F.3d 801, 811 (D.C. Cir. 1996)).

Although Prudential insists that its response satisfies the requirements of Rule 33(d), the Court finds otherwise. Plaintiff is entitled to have Prudential's explanation for the factual basis of its affirmative defenses as set forth in its answer, rather than a passing reference to the existence of the administrative record, which is an inadequate response under the case law that interprets Rule 33(d).

The same reasoning applies with equal force to interrogatory no. 3 by which Mullins seeks to obtain the identity of each individual that was involved in the decision of Prudential to deny his claim for LTD benefits. Prudential once again merely makes a general reference to the administrative record, or "claims file produced under seal," without adequate specification of the specific documents therein in violation of Rule 33(d). Accordingly, for the reasons previously stated with respect to interrogatory no. 2, the Court finds Prudential's response to be insufficient.

Prudential's response to interrogatory no. 4 likewise is inadequate. Interrogatory no. 4 requests that Prudential provide Mullins with its policies and procedures for accumulating and maintaining the documents found in its claims file. Prudential in its response, after objecting that the interrogatory is argumentative, merely advises that "all documents and evidence specifically considered in the administration of claims should be included or referenced in the claims file," to include documents submitted by the claimant, correspondence between Prudential and the claimant, claims log, notes of Prudential employees and communications with third-party clinical and vocational professionals. (DN 46, pp. 4-5).

The answer provided by Prudential is not responsive to the interrogatory, which seeks to obtain Prudential's official policies and procedures as they relate to the accumulation, organization and maintenance of claims files. The Court further notes that Prudential's response refers only to those items that "should be included," rather than to Prudential's own policies on what must be included and what may be excluded from a claims file. The Court therefore finds this response to be insufficiently responsive.

The Court agrees with Prudential concerning interrogatory no. 5, which seeks to obtain information concerning the attorneys' fees and costs that Prudential seeks to recover under ERISA's statutory attorney's fees provision. Obviously, until such time as Prudential prevails, or otherwise specifically requests an award of fees, discovery of this information would appear to the Court to be somewhat premature. The Court therefore defers the production of attorney-fee related information requested in interrogatory no. 5 until such time as it appears the

Prudential will make an application for attorney's fees and costs.[3]

In interrogatory no. 6, Mullins seeks information concerning each of the Prudential employees involved in the denial of his claim for LTD benefits. Specifically, he requests each individual's title, years of employment, rate of pay for the past three years (2007 to 2009), along with any bonuses, awards, recognition, or other remuneration during that time. Similarly, Mullins seeks the name and job title of any supervisor who evaluated the job performance of any of the employees identified during the same three-year time period (DN 46, p. 6). Prudential in its response objected to the interrogatory on various grounds that include relevancy, over breadth, the compound nature of the interrogatory, and based on privacy concerns. Further, Prudential again merely referred the Plaintiff to "the claims file produced under seal" in response to his request for the identities of the employees involved in the decision to deny him LTD benefits.

None of these objections are persuasive. The Court has already considered and rejected the notion that a passing reference to the claims file, which Mullins correctly notes contains some 1,300 pages, is sufficient to satisfy the requirements of Rule 33(d). It is not. Further, the interrogatory as structured is not fatally compound. The Advisory Committee Notes to the 1993 Amendments to Rule 33(a) caution that a party may not evade the 25 written interrogatory limit "through the device of joining as 'subparts' questions that seek information

---

[3] The Court does not disagree with the authority cited by Mullins at p. 6 of his motion to compel (DN 46, p. 6) wherein he cites to various decisions that require the disclosure of attorney fee agreements that are relevant to a party's claim for attorney's fees. Until such time as Prudential makes its claim concrete by way of an application, the Court merely considers the matter to be presently unripe for consideration.

about *discreet separate subjects*."  Fed.R.Civ.P. 33(a), 1993 Amendment, Advisory Committee

Notes( emphasis added).  In those instances, however, where the subparts of an interrogatory are

logically and factually related to the primary question, no violation of the Rule will be found as

the subparts are to be counted in the circumstances as but part of one interrogatory.  *See, Kendall*

*v. GE Exposition Services*, 174 F.R.D. 684 685-86 (D. Nev. 1997) (citing *Ginn v. Gemini, Inc.*,

137 F.R.D. 320, 322 (D. Nev. 1991)).  *See also*, *Thomas v. Yates*, 2009 WL 3272380 at *1-2

(E.D. Cal. Oct. 9, 2009) ("Determining whether an interrogatory counts as a separate question

requires a pragmatic approach. '[O]nce a subpart of an interrogatory introduces a line of inquiry

that is separate and distinct from the inquiry made by the portion of the interrogatory that

precedes it, the subpart must be considered a separate interrogatory no matter how it is

designated.') (citing *Waterbury v. Scribner*, 2008 WL 2018423 (E.D. Cal. 2008)).

Using this standard, the Court does not find interrogatory no. 6 to be improperly

compound as the subject matter of the interrogatory focuses upon the employment compensation,

in all forms, paid to or awarded to those employees of Prudential, and their supervisors, who

were involved in the decision to deny Plaintiff's claim for LTD benefits.  Accordingly, no

discreet subparts are required to be counted separate and apart from interrogatory no. 6.  To the

extent, however, that the interrogatory seeks to identify all supervisors or more senior employees

of Prudential who evaluated the job performance of their subordinate employees that participated

in the denial of Plaintiff's claim, the interrogatory seeks information beyond that contemplated

within the scope of post- *Glenn* discovery.

In this respect, Prudential's objection has merit given the apparent prohibition

from discovery of employee personnel files as set forth in the case law discussed above.  If

employee personnel files are not discoverable, a proposition that the Court believes to be well established in the Sixth Circuit, then any supervisor's evaluation contained therein likewise would be undiscoverable, even in the post- *Glenn* environment. If the supervisor's evaluation is not discoverable than disclosure of the information sought concerning supervisors would not lead to the discovery of relevant evidence under Rule 26(b)(1). The Court therefor agrees with Prudential that information concerning supervisors is not discoverable. Otherwise, the Court rejects the remaining objections of Prudential to the extent that the company relies upon relevancy, over breadth, undue vagueness or privacy-related concerns involving the employees who participated in the processing of Mullins' claim for LTD benefits.

Interrogatory no. 7 requests the specific basis on which Prudential denied Mullins' claim for LTD benefits. Once again, Prudential initially referred Mullins only to the claims file of the administrative record. In its supplemental answer, however, Prudential has referred Mullins to the specific pages of the claims file that contain the denial letters sent to him. Mullins has not renewed his objections in his reply. It therefore appears to the Court that the supplemental response of Prudential has satisfied his request in this regard.[4]

Interrogatory no. 8 requests from Prudential "the specific information that you would have needed in order to continue Plaintiff's ongoing benefits." Prudential has referred the Plaintiff to its final claims denial letter located at Bates Doc. D1252-D1262 in response. This

---

[4] The Court otherwise agrees with Mullins that he is entitled to know the factual basis of Prudential's denial of his claim for LTD benefits. One would naturally tend to conclude that Prudential relied upon the opinions of the MES physician/reviewers, both of whom concluded that Mullins had no functional limitations whatsoever from his medical conditions. Because Prudential's supplemental response apparently satisfies the Plaintiff's request, the Court makes no further ruling on it.

response is sufficiently specific to satisfy the requirements of Rule 33(d). Plaintiff has not further renewed his arguments in his reply concerning this particular interrogatory. Once again, the Court concludes that Prudential's supplemental response is sufficient.

The dispute concerning interrogatory no. 9 appears now to the Court to be moot as well. It requests the name, address, job title, employer and phone number of any medical or vocational professional who had rendered a report or opinion to Prudential or has examined the medical records of the Plaintiff. Prudential has provided the Plaintiff with the medical reports of the third-party physicians and vocational expert on which the company rested its determination to deny Mullins' LTD benefits claim. Mullins does not renew his arguments concerning interrogatory no. 9 in his reply. The Court concludes as before that he apparently is satisfied with its supplemental response.

Interrogatories 10 through 13 focus on information concerning the same medical and vocational reviewers discussed in interrogatory no. 9. Basically, Mullins seeks to know historic information concerning these reviewers' business relationship with Prudential. For example, interrogatory no. 10 requests Prudential to provide for 2007 through 2009, information concerning the number of times that each reviewer reviewed a claim on behalf of Prudential, and whether the reviewer was contacted directly by Prudential or by a third-party under contract with Prudential. Interrogatory no. 11 asks Prudential to provide information on how much each of these reviewers was paid, or its employer was paid, for their services in the Plaintiff's case and for their services in all such cases in which they reviewed claims during the same 3-year time period.

Interrogatory no. 12 relates directly to third-party reviewers, as opposed to

reviewers employed by Prudential, and seeks basically the same information requested in the immediately preceding interrogatories - - the number of claims reviews obtained from each third-party reviewer and how much each such reviewer was paid in 2007 through 2009. Interrogatory 13 asks the professional qualifications of each such reviewer and the policies of Prudential to ensure that each reviewer has obtained "appropriate training and experience in the field of medicine involved in the medical judgment." See 29 C.F.R. § 2560.503-1(h)(3)(iii).

Prudential in response to these interrogatories maintains initially that they fall outside the scope of appropriate ERISA discovery. This conclusion is rejected by the Court. The Court previously has discussed in depth the resulting changes to discovery following the rendition of the *Glenn* decision. ERISA plaintiffs are now fully entitled to examine the contractual and financial connections between claims reviewers and plan administrators/payors such as Prudential. The history of remuneration flowing to third-party service providers and the statistics concerning the number of claims reviewed in relation to the number of claims denied is now "fair game" for discovery.

While inquiry into the professional qualifications of such reviewers appears to remain outside the scope of discovery, Prudential has provided the Plaintiff with the medical credentials of its reviewers. Such credentials are set forth on the face of their medical reports. To this extent, the parties' dispute would appear to be moot. Otherwise, Mullins is entitled to the specific information that he seeks in interrogatories 10 through 13. Such information concerning the economic connection between, for example, MES and Prudential, is exactly the type of information relating to potential bias that district courts now have determined to be discoverable in this circuit.

25

The next series of interrogatories that are in dispute include interrogatory nos. 15 through 20. These interrogatories respectively seek to obtain: the total number of GFS employees to whom Prudential has paid LTD benefits (int. no. 15); the total dollar amount of LTD benefits paid to GFS employees by Prudential (int. no. 16); the dollar amount of premiums or other compensation Prudential has received from GFS for its LTD benefits policy (int. no 17); the total number of GFS employees who have applied for LTD benefits (int. no. 18); the total number of GFS employees who have received LTD benefits from Prudential, whose benefits have been denied or terminated (int. no. 19); the total number of GFS employees who have received LTD benefits from Prudential under its "any occupation" definition of disability and the average period during which such LTD benefits were paid (int. no. 20).

Mullins now insists that Prudential's claim that these interrogatories are unduly burdensome or irrelevant to the merits of his own LTD benefits claim is wholly without merit. He insists that Prudential's claims administration of the GFS Plan "goes to the heart of Prudential's fiduciary obligations to plan participants and the question of whether its claims practices are unduly influenced by its own financial interest." As for the burden of responding to these interrogatories, Mullins points out that insurers such as Prudential are ordinarily required by law to maintain accurate records concerning claims made and any payments made on such claims. Accordingly, Mullins insists that Prudential will be put to no undue effort to produce information that is directly relevant to the question of its inherent conflict of interest and the possible impact of that conflict on its claims history.

Prudential counters that Mullins' own "subjective relevancy yardstick" is hardly the appropriate measure for discovery even after *Glenn*. According to the company, the simple

number of GFS claimants who sought LTD benefits and the benefits decisions regarding each of those separate individuals does not bear on the question of alleged bias, and just as importantly, the question of whether Mullins actually is disabled within the meaning of the plan. Further, Prudential maintains that the difficulties in marshaling this type of broad ranging information and producing it in a fashion convenient to Mullins far outweighs any minimal potential value that one could conceptualize, given that any inference based on such aggregate data would be so speculative, and far removed from the specific circumstances of Mullins' own claim, as to be virtually non-existent.

The Court is aware of no post-*Glenn* decision of any district court in the Sixth Circuit which has taken discovery to such lengths as to include the production of statistical data across the entire range of LTD benefits claimants under a particular plan. Certainly, statistical information of itself is not in any sense out of bounds. In fact, in *Pemberton*, 2009 WL 89696 at *2, the district court indeed did permit an ERISA plaintiff to obtain statistical information concerning the number and status of claims considered by the particular reviewers who also handle the plaintiff's unsuccessful LTD benefits claim. *Pemberton* even permitted the plaintiff involved to obtain look back discovery about the number of claims filed and sent to reviewers, and the number of claim denials which resulted over a period of ten years prior to the denial of the plaintiff's claim. What the Court did not do in *Pemberton*, however, was to reach the question of whether it would permit similar discovery with respect to statistics involving an undetermined number of other claimants under the same LTD benefits plan.

This notion that an ERISA plaintiff is entitled to reach out to obtain discovery on any number of LTD benefit claimants who have applied, successfully or otherwise, under the

same employee benefits plan is unexplored legal territory to the Court's knowledge, at least in the context of ERISA. Neither party has cited any case law that has directly addressed this question. The Court is aware of none in this circuit. Several aspects of such requests, however, are troubling to the Court.

For example, in larger employee benefit plans such a request might involve literally hundreds of claimants and require substantial effort on the part of plan administrators to marshal, organize and convey the necessary information. Additionally, this information is not necessarily relevant until one looks behind the raw data generated to determine the cause for the resulting class-wide claims history. For example, if ten GFS employees applied for LTD benefits in 2005, and none were approved, this statistical information would be insufficient of itself to support an inference that Prudential arbitrarily and capriciously denied the LTD benefit claims of all ten, or any of the ten for that matter. Without further discovery to go behind the raw data, any possible of inferences might be, or might not be, supported by the data.

The same type of problem plagues Mullins' request for information on the profitability of the GFS Employee Benefit Plan for Prudential. Profitability, in and of itself, is not on its face an indication of bias so that whether Prudential hypothetically made $1 million or $5 million in gross revenue from providing LTD coverage would not resolve the issue of whether bias played a role in the resolution of Mullins' own claim. The Court is not unaware of the basic logic that every dollar in benefits paid reduces proportionately the income from premium payments made to Prudential by GFS employees. The disclosure of such raw data on gross income and profitability, however, simply does not resolve what is the central question as far as Mullins' own lawsuit is concerned - - whether Prudential's drive for profitability, the

*raison d'etre* for every corporation, affected the outcome of his LTD benefits claim.

At most, Mullins is left with the argument that to the extent his own claim was denied, Prudential avoided a reduction in its profitability through the payment of LTD benefits to him during that portion of his remaining work life in which he continued to satisfy the definition for disability found in the plan. This proposition is not illogical, but Mullins goes far beyond the information necessary to address his own individual claim of bias arising from Prudential's inherent conflict of interest. Accordingly, for all of the above reasons, the Court must agree with Prudential as to interrogatories 15 through 20 and denies the motion to compel in that regard.

The Court also agrees with Prudential concerning Mullins' motion to compel a response to interrogatory no. 21. This interrogatory seeks to determine the reserves and savings obtained by Prudential as a result of its decision to deny ongoing LTD benefits to him. In other words, Mullins asks the more specific question, essentially, how much money would you have lost if you were required to pay the disability benefits for the remainder of my work life? As Prudential points out, the amount of Mullins' monthly LTD benefit payment was previously established so that all Mullins need do is to multiply the monthly amount he received in LTD benefits by the number of months in his remaining work life in order to calculate the potential payout of benefits. More importantly, Prudential's response indicates on its face that no separate amount of reserves is maintained by Prudential. In view of the absence of a reserve amount, the Court can hardly compel Prudential to disclose a reserve that, according to its response, does not exist. The Court therefore will deny Mullins' motion to compel as to interrogatory no. 21.

The final interrogatory to be considered is interrogatory no. 23, in which Mullins requests that Prudential describe in detail its administrative processes and safeguards designed to

ensure and verify that benefit claim determinations are made in accordance with governing plan documents, and that plan provisions have been applied consistently with respect to similarly situated claimants (DN 46, p. 17).  Prudential in its response stated that its "administrative processes include but are not limited to training of claims professionals and quality review procedures."  *Id*.  Further, it responded that its administrative safeguards and processes "are evident from the administrative record already produced in this matter which demonstrates that personnel involved in analyzing initial claims and any subsequent administrative appeals examine the complete body of evidence in the administrative record are required to communicate the reasons for claim determinations as to claimants including reference to governing plan documents where appropriate."  *Id*. at 18.  Mullins now maintains that Prudential's response is insufficiently specific in view of the regulatory requirement established by 29 C.F.R. 2560.503-1(b)(5).  Prudential argues in its response that it has appropriately answered this interrogatory. Its response along with various documents previously provided, according to Prudential, fully sets forth the affirmative steps the company has taken to insulate decisions that concern benefit claims from potentially conflicting financial concerns.

The Court must disagree with Prudential on this point.  A mere reference to the existence of the "training of claims professionals" and to "quality review procedures" does not adequately disclose the substance of either the training or the review procedures.  Instead, at most, the response merely asserts their existence without providing meaningful detail thereof. Mullins is entitled to know specifically what training such claims professionals received relevant to the subject matter of the interrogatory and what quality review procedures are in place at Prudential and were used to ensure the fair and proper administration of his own claim.  For

these reasons, Mullins' motion to compel is **GRANTED** as to interrogatory 23.

**Requests for Production.**

The final matters to be addressed with respect to Mullins' motion to compel are his requests for production of documents. In total, Mullins served 26 document requests upon Prudential. He now challenges the adequacy of Prudential's response with respect to 15 of these document requests, which are discussed below. Because the subject matter of many of these document requests overlaps the interrogatories served by Mullins on Prudential, the Court need not analyze the document requests in the same level of detail as it did the disputed interrogatories.

The first request for production is Mullins' request that Prudential produce all documents relied on or referred to by it in each of its answers to his first set of interrogatories. (DN 46,p. 20). Prudential in its response merely advised Mullins that it had already produced to him the administrative record. Such response is inadequate to the extent that Prudential in its interrogatory responses referred to any documents outside the administrative record. For example, the training and quality review procedures referred to by Prudential in response to interrogatory no.23, to the extent that Prudential has not previously provided any such training materials or quality review procedures to Mullins, it must do so to the extent that such training materials or quality review procedures were relied on by Prudential in the administration of Mullins' own claim. The Court further agrees with Mullins that to the extent that Prudential has not previously provided to him all relevant documents as that term is defined in 29 C.F.R. 2560.503-1(m)(a)(3), Prudential is required to do so now.

It appears to the Court that document request nos. 2, 3 and 4 may now be moot. Document request no. 2 sought from Prudential all contracts between it and any third parties referenced in the interrogatories of the Plaintiff. Prudential has produced its contracts with MES, MLS and vocational expert Howard. Prudential advises there are no other contracts with third-parties relevant to Mullins' case. The same response is made to document request no. 3 seeking all contracts between Prudential and any healthcare professionals referenced in interrogatory no. 9. Prudential has provided the contracts with MES, MLS and Howard. Accordingly, the Court concludes that no further dispute exists as to these two document requests, a conclusion that appears to be supported by the fact that Mullins makes no mention of any of his document requests in his reply to Prudential's response to his motion to compel (Doc. No. 66). Document request no. 4, which seeks Prudential's attorney's fees contract and legal cost, has been determined to be premature at this point of the litigation. Prudential has advised that it will produce these documents in post-judgment discovery if and when they become relevant. This response presently is sufficient in the Court's view.

Document request no. 5 seeks the employment files of each person employed by Prudential who was involved in the decision to deny further LTD benefits to Mullins. This document request clearly falls outside the scope of the post- *Glenn* discovery available under the existing case law in this circuit. All of the district court decisions discussed above which touch upon discovery following *Glenn* uniformly hold that the personnel files, performance reviews and pay records of such employees are not discoverable. *See, McQueen*, 595 F. Supp.2d at 756 ("[T]he court will not require the defendant to respond to requests involving performance reviews and personnel files of reviewers who are its employees. The court finds that those

requests are unduly burdensome and their intrusiveness outweighs any likely benefit."); *see*

*Hays*, 623 F. Supp.2d at 845 ("The court will not permit discovery regarding individual

employees of Provident, including pay records and personnel files)*, see also Bird*, 2009 WL

3839478 at *3.  Accordingly, the Court denies Mullins' motion to compel as to request for

production no. 5.

Document request no. 6 also appears to the Court to have been resolved.  Request

no. 6 seeks to obtain documents relating to Prudential's written criteria or standards for

employee compensation, evaluation, performance, bonus and awards. (DN 46, p. 23).  Prudential

advises that it has provided Mullins with the requested documents in its supplemental response.

To the extent that Mullins apparently seeks to obtain intra-company communications relating to

the compensation or performance reviews of individual employees, however, his document

request goes beyond the parameters of allowable discovery as established by the above-cited

case law.

The same is true of Mullins' document request no. 7, to the extent he seeks all

performance evaluations, reviews or evaluations for each Prudential employee involved in the

determination of Mullins' LTD benefits claim.  The same case law cited immediately above

precludes discovery of such documents, as do other cases discussed earlier in this order.  *See,*

*Thornton*, 2010 WL 411119 at *3 (personnel files, performance reviews and disciplinary actions

involving reviewers are not discoverable).

Document request no. 8 relates to those documents involving training in the

processing and administration of claims and appeals provided to each Prudential employee who

was involved in the decision to deny further LTD benefits to Mullins.  Prudential advises in its

response to Mullins' motion to compel that it has supplied "all documents related to internal training/policies for its employees. Mullins does not dispute this assertion in his reply (DN 66), which focuses solely upon various disputed interrogatories. The Court therefore concludes that this matter also is resolved.

The next document request, no. 9, relates to any external training on claims processing and administration received by Prudential employees who were involved in the denial of Mullins' LTD benefits claim. Mullins cites as an example of such training the recent October 2009 conference held by the American Conference Institute on ERISA Litigation during which such topics as containing claims costs and "using the claims process to set up, control and strengthen the defense" were presented. He also points to the Defense Research Institute (DRI) and its annual seminar on life, health, disability and ERISA claims scheduled for April of this year, during which Prudential employee Leonard Guist, who manages litigation involving disputes over group disability insurance benefits, is scheduled to speak on unique strategies for reoccurring issues in the ERISA claims process. (DN 46, p. 26). Mullins insists that production of any training materials from such external seminars is relevant and discoverable to establish the potential bias of Prudential.

The Court agrees that the title of certain of the subject matter presented at the DRI and the ACI would on its face appear to have a defense oriented bent. The nature of such presentations is hardly startling, however, given that they are sponsored by defense oriented organizations. More importantly, production of such materials would not appear to the Court to necessarily bear directly on any potential bias of those employees who were directly involved in the administration of Mullins' own claim. First, an employee's voluntary attendance at such a

seminar would not tend to establish his or her bias. In fact, mere production of the seminar materials would not even establish whether the affected employee actually attended all sections of the seminar, including those with the type of defense-oriented titled cites in Mullins' motion to compel. Further, even if such employees did attend all sections of the seminar, that does not mean that their handling of Mullins' claim deviated from Prudential's internal policies and procedures. In other words, mere attendance at best raises a possible, albeit weak, inference of the attending employee's mind set, an inference several steps removed from any discernable impact on Mullins' claim for LTD benefits. The Court considers the potential relevance of such documents to be far exceeded by the burden placed on Prudential in obtaining them from each individual employee involved in the claims review process. Accordingly, the motion to compel is **DENIED** in this respect.

Documents request no. 10 for the curriculum vitae of each person referred to by Prudential in its answers to interrogatories is now moot. Prudential had provided the CVs for Drs. Fuchs and Rangaswamy, as well as that of Sue Howard and Terry Trout. Because Mullins now has these documents, nothing remains to be resolved by the Court.

As for document request no. 11, the Court considers it to seek documents far beyond the scope of discovery, even that permitted by *Glenn*. In this interrogatory, Mullins requests all documents that relate to any legal or administrative action filed by any person insured or covered under group insurance contract no. G-44096-MI. In other words, Mullins seeks virtually every administrative appeal and ERISA suit filed by any covered claimant under the Prudential group disability insurance plan obtained by GFS. Such documents, in the view of the Court, are not relevant in any meaningful sense, other than to clearly establish the

dissatisfaction of other claimants who have failed to qualify for LTD benefits themselves. The

same reasoning that applies to interrogatory request nos. 15-20, now applies with equal force to

document request no. 11. Additionally, as Prudential points out, many of the requested

documents would unavoidably contain medical and health information of a highly confidential

nature that could not be produced without raising serious HIPAA and privacy concerns that

make production of such documents far more burdensome than potentially relevant.

Accordingly, for these reasons, the motion to compel is **DENIED** with respect to document

request no. 11.

Document request no. 13 seeks to obtain the application, administrative and

underwriting files for group insurance contract no. G-44096-MI. In response, Prudential

supplied Mullins with only the group contract issued to GFS, rather than its application for such

contract and the administrative and underwriting files that were generated during the successful

application process. Mullins now seeks to have Prudential provide him with these documents,

which he explains will help establish the pricing model created by Prudential for the GFS plan

and the reserves and expected claims/loss ratio for the group policy issued. This information,

according to Mullins, runs to the profitability of Prudential, and therefore its financial bias in

favor of the denial of LTD benefit claims such as his own.

The Court has already discussed the various considerations that make such

information non-discoverable in the Court's view. No ERISA case rendered since *Glenn* in this

circuit holds such information to be discoverable to establish an inherent conflict of interest

resulting in a bias against payment of an otherwise meritorious LTD benefits claim. For the

same reasoning that the Court relied upon in relation to the related interrogatories, the Court now

concludes that this document request falls far outside the scope of discovery as it is presently

defined post- *Glenn*. Accordingly, the motion to compel is **DENIED**.

Document request nos. 14 and 15, likewise fail for the same reason. Request no.

14 asks for all documents that identify the reserves established for Mullins' LTD benefits claim

to date and any changes in such reserves. Request no. 15 asks for all documents from Prudential

that identify its gross revenues and/or its net profit generated by group insurance contract no. G-

44096-MI. Such documents are not discoverable. The information contained in them would be

relevant only to establish the profits that Prudential has obtained through its administration of the

group insurance contract at issue. The Court previously has set forth its reasoning why this

information is not discoverable and its view on the matter remains unchanged at this point.

The final document request, no. 4, involves the request of Mullins for the master

insurance policy filed by Prudential with Michigan insurance authorities. Prudential advises in

its response to the motion to compel that it has now supplemented its discovery responses to

include the requested master insurance policy. Accordingly, this document request is no longer

at issue. No further document requests are mentioned by Mullins in his motion to compel. His

reply in support of such motion contains no discussion of any of the above-mentioned document

requests. The Court therefore concludes that all of the document requests are now sufficiently

addressed by the contents of this order.

**GFS Motion for Protective Order.**

The final motion is the motion of GFS for a protective order. The motion for

protective order now appears to the Court to be largely resolved. Mullins in his response to the

GFS motion indicates on the final page of his response that he would be satisfied if GFS simply provided him with information concerning its past practices in seeking reimbursement of alleged overpayment of LTD benefits. In response, GFS in its own reply has included the affidavits of Joseph McFawn and Wayne VanderMolen (DN 70 Ex. A and B). McFawn is the disability and workers' compensation manager for GFS since June of 2007. VanderMolen is the supervisor of the division safety and disability for the Great Lakes division of GFS and was its disability and worker's compensation manager from June 2007, through July of 2010. Together, the affidavits of McFawn and VanderMolen advise that prior to Mullins' case, GFS had never been aware of a situation in which a participant in its employee disability benefits plan had been overpaid disability benefits. Mullins case is, according to McFawn and VanderMolen, the first time that GFS has ever sought reimbursement of an alleged disability benefits overpayment. Because this information fully addresses Mullins' remaining discovery concern involving GFS, the Court considers the entire matter to be fully resolved. Accordingly, the motion for protective order appears to the Court to be **MOOT**.

April 30, 2010

**Dave Whalin, Magistrate Judge**
**United States District Court**

Copies to Counsel of Record