UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JOHN A. MULLINS                                        PLAINTIFF

v.                                        CIVIL ACTION NO. 3:09-CV-371-S

PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.              DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on the motion of defendant GFS Division Voluntary

Employee Benefit Plan (the "GFS Plan") for judgment on the administrative record and for summary

judgment (DN 53) and the accompanying cross-motion for judgment on the administrative record

and summary judgment of plaintiff John A. Mullins ("Mullins") (DN 72). For the reasons set forth

below, the GFS Plan's motion for judgment on the administrative record will be granted. The GFS

Plan's motion for summary judgment on its counterclaim against Mullins will also be granted.

Mullins' cross-motions for judgment on the administrative record and summary judgment will be

denied.

## I. BACKGROUND

*1. Mullins' Claim Against the GFS Plan*

Plaintiff John A. Mullins ("Mullins") is a former employee of a subsidiary of Gordon

Food Service, Inc. ("GFS"). While thus employed, Mullins was a participant in the GFS Division

Voluntary Employee Benefit Plan, which provides long-term disability benefits to eligible

employees. GFS, Inc. serves as both the Plan Sponsor and Plan Administrator.

The GFS Plan operates on a two-tiered system: GFS itself provides a one-year, long-term

disability benefit for eligible employees (the "GFS Benefit"), which is paid from a company-sponsored trust fund and is available to employees at no charge. GFS also makes available a Voluntary Long-Term Disability Benefit (the "Voluntary Benefit"), which employees may purchase separately. The Voluntary Benefit consists of a fully insured plan administered by an outside vendor – in this case, Prudential Insurance Company of America – that provides benefits beyond those available under GFS' self-insured plan.

In the GFS Plan documents distributed to employees, the long-term disability benefits are generally described as follows:

> 12.1 Participation
>
> Each employee who is a Participant . . . shall be eligible to receive the Long-Term Disability Benefit upon submission of satisfactory proof of his Total and Permanent Disability to the Plan Administrator. For purposes of this Article, "Total and Permanent Disability" means an Illness or Injury which renders a participant incapable of performing all the duties of his particular job.
>
> GFS Plan § 12.1.

Participants are eligible to receive the GFS Benefit for up to one year after they meet the definition of Total and Permanent Disability. *See* GFS Plan, § 12.2.

The Voluntary Benefit is described as follows:

> 12.12 Voluntary Long-Term Disability Benefit
>
> As an alternative to the Employer-provided Long-Term Disability Benefit . . . eligible Participants may elect to purchase a Voluntary Long-Term Disability Benefit, as described in this section. If an eligible Participant elects to purchase the Voluntary Long-Term Disability Benefit, the following rules apply:
>
> (a) In the event of Total and Permanent Disability, the Participant shall first receive the Employer-provided Long-Term Disability Benefit . . . .
>
> (b) Thereafter, if the Participant continues to be Totally and Permanently

Disabled, the Participant shall be eligible to receive a supplemental Long-Term Disability Benefit. The supplemental Long-Term Disability Benefit shall be provided through a fully-insured policy. The policy shall be similar, but not identical to the Employer-provided Long-Term Disability Benefit . . . .

GFS Plan § 12.12.

Stated concisely, the GFS Plan documents provide that an employee who suffers a "Total and Permanent Disability" that renders him unable to do all the duties of his current job qualifies for the GFS Benefit. If the employee has purchased the optional Voluntary Benefit, that employee must first exhaust the GFS Benefit; if he continues to be "Totally and Permanently Disabled," he is then eligible to make a claim with the Voluntary Benefit provider.

Mullins participated in the GFS Plan and chose to purchase the Voluntary Benefit. In October 2005, Mullins became unable to perform the duties of his job, which rendered him "Totally and Permanently Disabled" according to the GFS Plan's standard. He filed a claim with the Plan, which was approved. From October 5, 2005 to October 4, 2006, Mullins received benefits from the GFS Plan. The GFS Plan claims – and Mullins does not dispute – that Mullins received the full amount of benefits he was due under its Plan for those 12 months.

In October 2006, Mullins applied for supplemental disability benefits under the Prudential-administered Voluntary Benefit policy. The Prudential policy contains its own set of conditions with respect to eligibility. Under the Prudential plan, a participant may receive benefits for up to 24 months if he satisfies an "own occupation" disability standard – that is, if he is unable to work in the occupation he held before becoming disabled. After 24 months, however, a participant must be unable to work in *any* gainful occupation to continue receiving benefits.

In accordance with the terms of its plan, Prudential paid benefits to Mullins for the period

from October 2006 through October 2008. In October 2008, however, Prudential terminated Mullins' benefits after determining that Mullins was not disabled under its "any gainful occupation" standard.

Following Prudential's termination of Mullins' disability benefits, Mullins requested reinstatement of his benefits from the GFS Plan. The GFS Plan, through its attorney, denied Mullins' claim on the grounds that it had already paid him the maximum amount of benefits required under the Plan. The GFS Plan informed Mullins that it had satisfied his obligations and told him to direct any appeal to Prudential, the provider of the Voluntary Benefit. Mullins appealed the decision to the GFS Plan, and the GFS Plan, again through its attorney, denied his claim.

Mullins then filed this action pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), claiming that the GFS Plan standard of "Total and Permanent Disability" should apply both to the one-year GFS Benefit and the Voluntary Benefit and that the terms of the GFS Plan require it to continue paying him disability benefits until he becomes ineligible due to age, death, or recovery. The GFS Plan now moves for judgment in its favor on the administrative record; Mullins also moves for judgment on the administrative record.

*2. The GFS Plan's Counterclaim Against Mullins For Overpaid Benefits*

At some point after becoming disabled, Mullins applied for Social Security Disability Income ("SSDI") benefits. Following an appeal, an Administrative Law Judge awarded Mullins SSDI benefits in July 2007. In September 2007, Mullins received a lump-sum payment for SSDI benefits, retroactive to April 2006. The GFS Plan claims it is entitled to recover $8,708 in

benefits it paid to Mullins because Mullins received both SSDI benefits and GFS Plan benefits for the months of April to October 2006.

The GFS Plan contains provisions allowing it to offset the benefits it pays by the amount of SSDI benefits a Participant receives during a given month. GFS Plan § 12.5. The Plan also calls for any lump-sum payment a Participant might receive to be allocated as though it were a monthly payment: "In the event a Participant receives a lump sum payment from any of the sources specified . . . the payment shall be allocated as if the Participant had received the benefit on a periodic basis." GFS Plan § 12.7.

Finally, the Plan contains a repayment provision, captioned "Incorrect Payments," allowing the Plan to recover overpaid benefits: "If the Plan pays benefits which should not have been paid by the Plan, the Plan may recover the excess payments from the Participant . . . in the Plan Administrator's discretion." GFS Plan § 15.10.

The GFS Plan did not offset its payment of benefits to Mullins by the amount of SSDI benefits Mullins received.[1] In July 2009, it filed a counterclaim against Mullins seeking reimbursement of benefits paid during the months Mullins was also receiving SSDI. Mullins stated in an affidavit that he no longer has the benefits GFS paid him between April and October 2006 because he used the funds to pay bills. Decl. of John A. Mullins, ¶ 9. He also stated that he has exhausted his pre-disability savings, and his only current and future income consists of SSDI benefit checks. *Id.* at ¶¶ 13–14.

_____

[1]In its motion for summary judgment, the GFS Plan claims this is because it was not aware Mullins was receiving benefits. However, because his claim was involved in an appeal, Mullins did not actually receive the benefits until September 2007. GFS would not have been able to offset its benefits contemporaneously because Mullins did not receive the SSDI benefits until 11 months after the GFS Plan had stopped paying him its own benefits.

The GFS Plan claims that by virtue of the "offset" and "incorrect payment" provisions in the plan documents, it is entitled to recover $8,708 in overpaid benefits from Mullins. The GFS Plan and Mullins have both moved for summary judgment on the GFS Plan's counterclaim for reimbursement.

## II. STANDARD OF REVIEW

In an ERISA benefit action, a district court reviews denial of benefits decisions "based solely on the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The court "may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator." *Id.*

The standard of review a court employs when reviewing an ERISA plan administrator's denial of benefits depends on the discretionary authority granted to the plan administrator by the plan documents. *See Wilkins,* 150 F.3d at 613 (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If a plan does not provide an administrator with any discretionary powers, the court reviews the administrator's decisions *de novo*. *Id.* However, if a plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," an arbitrary and capricious standard of review applies. *Whitaker v. Hartford Life and Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) (quoting *Firestone*, 489 U.S. at 115).

Here, the GFS Plan documents explicitly provide the Plan Administrator with the discretionary power to perform a number of duties related to the administration of the Plan. Section 19.2(b) of the Plan authorizes the Plan Administrator to "[c]onstrue and interpret the

Plan; decide all questions of eligibility; and determine the amount, manner, and time of payment of benefits." This clear grant of discretionary authority to the Plan Administrator warrants the application of an arbitrary and capricious standard of review. *See Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005).

Mullins raises two objections to use of the arbitrary and capricious standard. First, he claims the GFS Plan is operating under a fundamental conflict of interest that requires more searching review. It is true that a conflict of interest exists where, as here, the plan administrator is the same party that ultimately pays the plan benefits. *See Gismondi*, 408 F.3d at 299, citing *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). However, the conflict of interest in and of itself does not alter the standard of review. *Whitaker*, 404 F.3d at 949. Rather, a conflict of interest is a "factor" that courts must weigh when evaluating a plan administrator's decision under the arbitrary and capricious standard. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

Second, Mullins argues that the GFS Plan improperly delegated its discretionary authority to its attorney, Mary Bauman, which would render any decision she made subject to *de novo* review. *See Sanford v. Harvard Indus.*, *Inc.*, 262 F.3d 590, 597 (6th Cir. 2004) (benefit denials issued by "an unauthorized body that does not have fiduciary discretion" are not entitled to deferential review).

As explained above, Mullins contacted the GFS Plan after Prudential terminated his benefits. His communications were apparently forwarded to Bauman, who identifies herself in her letters to Mullins as an attorney for GFS and the GFS Plan. Both of Bauman's letters to Mullins explain the GFS Plan's position that it had already paid Mullins the maximum benefit

owed under the GFS Plan, and that any further appeals needed to be addressed to Prudential. It is unclear whether Bauman herself actually made the decision that the GFS Plan had paid Mullins all benefits owed under the Plan or whether she was acting on the orders of the GFS Plan. Regardless, Bauman is not an "unauthorized body" whose decisions would be subject to *de novo* review.

As GFS points out, Section 19.2(i) of the GFS Plan documents authorizes the delegation of authority to "individuals or entities to assist in the administration of the Plan . . . and other agents it deems advisable, including legal counsel." In her letters to Mullins, Bauman identifies herself as "attorney for GFS and the GFS Division Voluntary Employee Benefit Plan" and notes that GFS forwarded Mullins' letters to her. While Bauman does not make an explicit statement concerning the basis of her authority, it is clear from the letters that GFS intended Bauman to act on its behalf with respect to Mullins' claims. There was no improper delegation of authority that would warrant heightened review. This court will review the GFS Plan's decision under the arbitrary and capricious standard.

The arbitrary and capricious standard is highly deferential to the decisions of the plan administrator. *See Gismondi*, 408 F.3d at 298. While arbitrary and capricious review does not require a court to "rubber stamp," an administrator's decision, *Glenn v. Metlife Ins. Co.*, 461 F.3d 660, 661 (6th Cir. 2006), a court must uphold a plan administrator's decision if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). A court must accept a plan administrator's "rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Gismondi*, 408 F.3d at 298,

citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004).

### III. THE GFS PLAN'S INTERPRETATION OF THE PROVISIONS

*1. The Plan Language*

This matter centers on the interpretation of Article 12 of the GFS Plan documents, which puts forth the terms applicable to both the GFS Benefit and the Prudential-administered Voluntary Benefit.

Mullins claims that the "Total and Permanently Disabled" standard, which is defined at the beginning of Section 12 of the GFS Plan, should also apply to the Voluntary Long-Term Benefit Plan described in Section 12.12(b). He argues that the language of the GFS Plan entitles him to the Voluntary benefit so long as he is "Totally and Permanently Disabled" according to the standard put forth in Section 12.1 of the GFS Plan documents. Because the standard for disability in the Prudential plan was more stringent than that in the GFS Plan, Mullins claims the GFS Plan impermissibly added terms and requirements that were not contained in the policy documents and therefore is liable to him under the Plan for disability benefits as long as he is unable to work in his former job.

The GFS Plan, on the other hand, argues that the "Totally and Permanently Disabled" standard in 12.12(b) is simply a triggering provision for the Voluntary Benefit that does not extend to the terms of the insured plan. Under the GFS Plan's interpretation, a participant must be "Totally and Permanently Disabled" in order to for the Voluntary Benefit policy to begin. After the participant meets this threshold, however, the continued distribution of the Voluntary Benefits is governed by the terms of the insurance policy – not the GFS Plan.

Provisions contained in an ERISA-governed benefit plan must be interpreted according

to their "plain meaning, in an ordinary and popular sense," *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (citations omitted). "[F]ederal courts may not apply common law theories to alter the express terms of written benefit plans." *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997) (citations omitted). The "plain language of an ERISA plan should be given its literal and natural meaning." *Id.* (citing *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989)).

As noted above, the relevant language in the GFS Plan reads as follows: ". . . [I]f the Participant continues to be Totally and Permanently Disabled, the Participant *shall be eligible* to receive a supplemental Long-Term Disability Benefit. The supplemental Long-Term Disability Benefit shall be provided through a fully-insured policy. The policy shall be similar, but not identical to the Employer-provided Long-Term Disability Benefit."  GFS Plan § 12.12(b) (emphasis added).

Taken according to its "literal and natural meaning," this language supports the GFS Plan's interpretation. The provision states that a Participant who is "Totally and Permanently Disabled" is *eligible*[2] to receive the Voluntary Benefit. It contains no promise, however, that the Participant will actually receive the benefit. The provision also contains an explicit warning that the Long-Term Disability Benefit is provided by a fully-insured policy, which is "similar, but not identical" to the GFS Benefit. Taken as a whole, this provision supports the GFS Plan's contention that continued "Total and Permanent Disability," according to the GFS standard

---

[2]Black's Law Dictionary defines "eligible" as "[f]it and proper to be selected or to receive a benefit; legally qualified for an office, privilege, or status." BLACK'S LAW DICTIONARY 597 (9th ed. 2009); similarly, Webster's Dictionary defines "eligible" as "fitted or qualified to be chosen or used : entitled to something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 736 (1981).

serves only as a threshold for receipt the Voluntary Benefit and does not govern the Voluntary Benefit policy's terms.

Mullins argues that such an interpretation of the Plan renders the "Total and Permanent Disability" language "meaningless." This is simply not the case. As explained above, the "Total and Permanent Disability" standard is a necessary trigger for the Voluntary Benefit Plan. The fact that the insurer providing the Voluntary Benefit employs a different standard than the GFS Plan when providing its own benefits does not change the applicability of the standard contained in Article 12 of the GFS Plan.

Mullins also points to other provisions in the GFS Plan documents that explain different fully insured benefits, arguing that the GFS Plan should have used similar language in its provision governing the Long-Term Disability Benefits. For instance, Mullins notes that the Section 13.3 of the Plan, which outlines the Terms and Conditions of Coverage for the GFS Plan Term Life Benefit explicitly incorporates the terms of the Term Life insurance policy into the GFS Plan.[3] He argues that had the GFS Plan intended the Voluntary Benefit Plan to operate

_____

[3]This provision states:

> 13.3 Terms and Conditions of Coverage
>
> The terms and conditions of the Group Term Life and AD&D Insurance Benefit are stated in the Policy. The Policy is incorporated into and made a part of the Plan.

The Plan uses similar language in its explanation of its Part-Time Group Medical, Dental and Vision Insurance Benefit:

> 14.3 Terms and Conditions of Coverage
>
> The terms and conditions of the Group Medical, Dental and Vision Insurance Benefit are stated in the policy. The Policy is incorporated into

under different terms and conditions, it should have used similar language in § 12.12(b).

Mullins' argument does little to undermine the GFS Plan's interpretation of § 12.12(b). First, it is not evident from the pleadings exactly how the Term Life and Part-Time Benefits Mullins cites are intended to operate. It is unclear whether these benefits are identical in form and function to the Voluntary Benefit provided in § 12.12(b). If they are not, then it would have made little sense for the GFS Plan to use identical language in drafting them. Even if the benefits are the same, however, the GFS Plan correctly points out that nothing requires it to use identical language in different parts of the plan documents. Section 12.12(b), standing on its own, is unambiguous with respect to its terms and conditions. That it differs from other sections that may or may not have a similar intent does not render the GFS Plan's interpretation improper or irrational.[4]

*2. The GFS Plan's Conflict of Interest*

When conducting its arbitrary and capricious review, a district court must take into account the *per se* conflict of interest present when a plan administrator is ultimately the same

---

and made a part of the Plan.

[4]The GFS Plan makes an additional argument for the rationality of its interpretation by referencing Section 4.5 of the Plan documents, which states in relevant part:

> [I]f there is any conflict between the terms of the Plan and any insurance policy, the terms of the policy shall control only to the extent necessary to avoid a requirement that the Plan pay benefits which are not applied against or eligible for excess or stop loss insurance coverage under any policy.

Mullins claims the GFS Plan's use of this provision in its claim consists of a *post hoc* argument that falls outside the administrative record. Because it appears to this court that the Plan's interpretation of Section 12.12(b) is rational based on the natural and literal meaning of the language, these arguments need not be addressed.

party that pays the plan benefits. *Gismondi*, 408 F.3d at 299. When considering conflict of interest as a factor in its arbitrary and capricious analysis, "[t]he reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 878 (6th Cir. 2006).

In this case, GFS, Inc. both administrates and funds the GFS Plan.[5] Any potential conflict, however, is mitigated by the company's use of a trust fund. Section 20.3 of the Plan provides that the fund "shall be used for the exclusive benefits of the Participants," while Section 4.3 states, "The Company shall have no right, title or interest in any contribution made by it to the Trust Fund. No part of the Trust Fund . . . shall revert to or inure to the benefit of the Company." Furthermore, GFS funds its trust based on "actuarial valuation" – not on the number of claims actually filed. The amount GFS contributes to its trust fund is based on an objective valuation of the likelihood of participants' future claims; thus, GFS would have little motive to deny a claim based on its conflict of interest.[6]

Mullins presents no specific evidence, beyond the existence of a *per se* conflict of interest mitigated by the use of a trust fund, that the GFS Plan's interpretation of its provision

_____

[5]GFS pays for Plan benefits through an employer-supported trust fund. *See* GFS Division Voluntary Employee Benefit Plan, Art. 1. Section 4.1 of the Plan documents provides: "The Company shall contribute to the Trust Fund each Plan Year the amount required to (a) fund the present value of the benefit payments expected to be made to the Participants, as determined by actuarial valuation, amortized over a reasonable period of years; and (b) accumulate a reasonable reserve."

[6]Mullins argues that despite the trust fund, the threat of a self-interested determination persists because GFS would ultimately be responsible for any shortfall that would result if the trust fund were depleted. However, we agree with the court's statement in *Peterson v. Principal Fin. Grp.* that "such a connection is too tenuous to raise the possibility of conflict above the speculative level." 2008 WL 4630576 at *6 (D. Colo. Oct. 17, 2008).

was influenced by its own interest. Having taken this conflict into account, and having reviewed the plan provisions in question, this court concludes that the GFS Plan's interpretation of § 12.2(b) of the plan documents was not arbitrary and capricious. Therefore, the GFS Plan's motion for judgment on the administrative record will be granted.

### IV. GFS PLAN'S COUNTERCLAIM FOR OVERPAYMENT OF BENEFITS

This court now addresses the GFS Plan's motion for summary judgment, which it has filed with respect to its counterclaim against Mullins for overpayment of benefits. Mullins has filed a cross-motion for summary judgment on this claim.

Section 502 of ERISA, 29 U.S.C. § 1132(a)(3) authorizes a plan beneficiary, participant, or fiduciary to bring a civil action to enforce the provisions of the plan. *Id.* at § 1132(a)(3)(A). Recovery under this provision, however, is available only in the form of an equitable remedy. *Id.* at § 1132(a)(3)(B).

Summary judgment is appropriate "if the pleadings, the discovery and the disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The party moving for summary judgment bears the burden of demonstrating that these requirements are met. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The GFS Plan argues that it is entitled to summary judgment because Mullins received SSDI benefits for the months of April to October 2006 – months when it was also paying him benefits. It claims that the language of the plan provisions entitled it to offset Mullins' benefits by the amount of SSDI benefits paid, and, because it did not take the offset during the months in question, that the "incorrect payments" provision in the Plan authorizes it to seek reimbursement.

Mullins claims he is entitled to summary judgment because (1) the GFS Plan lacks standing to bring a counterclaim against him; (2) the language of the Plan does not permit recovery of lump-sum SSDI benefits; (3) the Plan's claims are barred by a statute of limitations contained in the plan and the doctrine of laches; and (4) that the Plan seeks a legal judgment, rather than the equitable remedy permitted by statute. As explained below, we find all of these claims to be without merit.

*1. The GFS Plan Has Standing to Bring Its Counterclaim Against Mullins*

Mullins first argues that the GFS Plan lacks standing to assert a claim pursuant to Section 502 of ERISA, 29 U.S.C. § 1132(a)(3) because the Plan itself – not the Plan Sponsor or Administrator – is bringing the action.

Under ERISA, "A civil action may be brought . . . by a participant, beneficiary, or fiduciary . . . to enjoin any act or practice which violates any provision [of ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3)(A). "Only the parties specifically enumerated" in this statute may bring suit under it. *Cob Clearinghouse Corp v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir. 2004). *See also Simon v. Belwith Int'l, Inc.*, 3 Fed. App'x 363, 364–65 (6th Cir. 2001) (holding that an assignee of a plan beneficiary's rights lacked standing to maintain an ERISA action). Here, the GFS Plan is neither a participant nor a beneficiary; rather, it claims it has standing as a "fiduciary."

Under ERISA, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property

of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility." 29 U.S.C. § 1002(21)(A).

The Sixth Circuit has held that, under some circumstances, an ERISA-governed plan itself can fall within the definition of a "fiduciary." *See Saramar Alum. Co. v. Pension Plan for Emps. of the Alum. Indus. and Allied Indus. of Youngstown Ohio Metro. Area*, 782 F.2d 577, 581 (6th Cir. 1986). In *Saramar*, the court took up the question of whether a jointly sponsored employee benefit plan could bring an action against an employer for delinquent benefit payments. The plan at issue in *Saramar* was administered by an "Administrative Board," whose discretionary authority included "all such powers" to carry out the provisions of the plan, including determining "all claims, demands and actions arising out of the provisions of this Plan." *Id.*

The court explained that "[t]he Plan, as the party before the court, necessarily includes those who must act for the Plan to administer it and to effectuate its policies," *id.*, and held that in the *Saramar* case, the plan could properly be considered a fiduciary qualified to bring an ERISA action. *Id.*

The GFS Plan operates under a similar administrative scheme to the plan at issue in *Saramar*. The GFS Plan delegates all "discretionary authority and responsibility for the general administration of the Plan" to a Plan Administrator. GFS Plan § 19.2. Mullins argues that these discretionary functions are expressly reserved for the Plan Sponsor rather than the Plan Administrator. However, § 19.1 of the Plan specifically names the Plan Sponsor as the Plan Administrator. It is apparent from the Plan documents that the Plan Sponsor serves a dual role as both Sponsor and Administrator, and therefore Mullins' argument on this point is irrelevant.

Mullins also dismisses the court's holding in *Saramar* as dicta, citing a concurring judge's disagreement with the majority's recognition of the plan as a fiduciary. *Saramar*, 782 F.2d at 583–85 (Contie, J., concurring). *Saramar*, however, is good law in the Sixth Circuit. *See Whitworth Bros. Storage Co. v. Cent. States, Se. and Sw. Areas Pension Fund*, 794 F.2d 221, 225 n.5 (6th Cir. 1986) (citing the holding in *Saramar* and explaining that plans may maintain an action under § 1132(a)(3) even though they are not specifically listed as eligible parties in the statute); *Reinhart Cos. Emp. Benefit Plan v. Vial*, 2009 WL 4639509 at *5 (W.D. Mich. Dec. 2, 2009) (stating, "the Sixth Circuit has held that although an ERISA plan does not fall within the statutory definition of a 'fiduciary,' a plan may maintain an action under ERISA"); *Chaness & Simon, P.C. v. Simon*, 241 F. Supp. 2d 774, 778–79 (E.D. Mich. 2003) (citing *Saramar* for the proposition that an ERISA-governed plan is a proper plaintiff in an ERISA action), *Flanagan Liberman Hoffman & Swaim v. Transamerica Life and Annuity Co.*, 228 F. Supp. 2d 830, 840 (S.D. Ohio 2002) (explaining that under *Saramar's* analysis, "a plan is a fiduciary insofar as it is nothing less than its administrators, who are themselves fiduciaries.").

Finally, Mullins calls the court's attention to a section of ERISA that requires employee benefit plans be established and maintained pursuant to a written instrument. 29 U.S.C. § 1102(a)(1). This portion of the statute mandates that the instrument "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* It is unclear how this statute undermines the GFS Plan's fiduciary status. The Sixth Circuit explained in *Saramar* that plans and their fiduciaries are, under circumstances like those in this case, one and the same; that the fiduciaries of a plan must comply with administrative procedures under ERISA does not alter this holding.

In accordance with the Sixth Circuit's holding in *Saramar*, this court finds that the GFS Plan is a "fiduciary" under 29 U.S.C. § 1132(a)(3) and therefore has the standing necessary to bring its counterclaim against Mullins.

2. *The GFS Plan's Counterclaim Is Not Barred By The Language of the Plan*

Mullins next argues that the language of the Plan itself does not permit the GFS Plan to recover Social Security benefits awarded retroactively.

> The Plan provides: "The offset amount for any month or lesser period for which a Long-Term Disability Benefit is payable shall be the sum of the following amounts to the extent that the amounts are provided for during that month or lesser period."

> GFS Plan § 12.5.

Mullins argues that this language prevents the GFS Plan from recovering overpayments for SSDI benefits awarded retroactively because of the phrase, "provided for during that month." A plain reading of this provision, however, indicates otherwise. The "provided for" language does not require actual receipt; instead, it requires that benefits be "provided for" that particular month. The Plan says nothing about the timing of the receipt of benefits as a prerequisite for offset. It also contains a provision explicitly allowing allocation of retroactively awarded SSDI benefits. *See* GFS Plan § 12.7 ("In the event a Participant receives a lump sum payment . . . the payment shall be allocated as if the Participant had received the benefit on a periodic basis.") Based solely on a plan reading of the plan, Mullins' argument on this count fails.

3. *The GFS Plan's Counterclaim Is Not Barred By The Statute of Limitations or Laches*

Mullins contends that the GFS Plan's counterclaim is barred by a statute of limitations in the Plan documents and by the doctrine of laches. Both of these arguments are without merit.

Mullins correctly asserts that the Plan states "No legal action may be brought after the

expiration of two years after the time the Participant has been provided with an initial written notice denying the claim, in whole or in part." GFS Plan § 15.8. Mullins, however, misconstrues this provision. Based on the prefatory language contained at the beginning of Article 15, it is clear that this provision pertains to participants' claims against the Plan rather than the Plan's actions against participants; therefore, the two-year limitations period is inapplicable to the GFS Plan's counterclaim. Mullins points to no provision in the GFS Plan that puts forth an applicable statute of limitations for claims by the GFS Plan against participants, nor does he argue that the GFS Plan's claim is barred by any statute of limitations other than that in the Plan documents.

Mullins' argument with respect to laches also fails. Laches is "a negligent and unintentional failure to protect one's rights." *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227 (6th Cir. 2007) (quotation marks omitted). "The party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller, Inc. v. Palazzetti Imps. and Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001). Simply remaining passive does not ordinarily give rise to the defense of laches; rather, a party must "[do] some act to induce or encourage another to alter his condition," rendering it "unconscionable to award the claimed rights." *Tully Constr. Co., Inc. v. Cannonsburg Envtl Assocs., Ltd.,*, 72 F.3d 1260, 1268 (6th Cir. 1996) (quotation omitted).

Mullins received his SSDI benefits in September 2007, but the GFS Plan did not file a claim to them until July 2009. Because of this, Mullins argues the GFS Plan's action should be barred. The defense of laches, however, is inapplicable here. Even if the 22-month delay were the result of a "lack of diligence" on the GFS Plan's part, Mullins fails to show how the passage of time prejudiced his case.

From the moment he received the Plan documents, Mullins was on notice that the GFS Plan claimed entitlement to any overpaid benefits, including any benefits paid during months the participant also received SSDI benefits. *See* GFS Plan §§ 12.5, 15.10. Furthermore, the Plan took no affirmative action that indicated to Mullins that it did not plan to seek repayment. The conditions here do not warrant application of the laches doctrine.

*4. The GFS Plan May Recover the Benefits Overpaid to Mullins*

In order to make a proper equitable claim under § 1132(a)(3), the claimant must (1) identify a particular fund distinct from the plan member's general assets and (2) specify the particular share of the fund to which the plan is entitled. *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356, 363–64 (2006). The Supreme Court explained in *Sereboff* that, with respect to reimbursement provisions in plan documents, "the familiar rul[e] of equity that a contract to convey a specific object ever before it is acquired will make the contractor a trustee as soon as he gets a title to the thing" applies. 547 U.S. at 363.

Mullins argues that the GFS Plan's action cannot sound in equity because it seeks payment only from Mullins' general assets rather than from a specific fund. Mullins argues that because he has already spent the Social Security and GFS Plan benefits for the months in question, there exists no particular fund to which the Plan can lay claim, and any claim would necessarily be against his general assets.

Courts in the Sixth Circuit, however, follow *Sereboff's* holding that an amount need not be directly traceable or currently intact to qualify as a "particular fund." *Longaberger Co. v. Kolt*, 596 F.3d 459, 466–67 (6th Cir. 2009) ("[A]n equitable lien by agreement does not require tracing or maintenance of a fund in order for equity to allow repayment.").

In *Longaberger*, the Sixth Circuit held that an employee benefit plan could recover in equity funds owed under its reimbursement provisions even though those funds had been distributed and dissipated. 596 F.3d at 469. The plan at issue in *Longaberger* contained provisions giving it an automatic "first priority lien upon the proceeds of any recovery . . . from [a third party] to the extent of any benefits provided to you . . . by the Plan." *Id.* at 467. The court held that this equitable lien attached to the proceeds of a participant's settlement with a third-party insurance company once the settlement money was distributed to the participant's attorney, thus providing the plan with an equitable entitlement to the money as soon as it was identified and received. *Id.* Although this settlement money was dissipated a few months later, the Longaberger plan retained its equitable claim against the fund. *Id.*

The Sixth Circuit reached a similar result in *Gilchrest v. Unum Life Ins. Company of Am.*, 255 Fed. App'x 38 (6th Cir. 2007) (unpublished). In *Gilchrest*, a participant in a long-term disability benefits plan received both disability and SSDI payments at the same time. *Id.* at 45. The plan documents provided that disability benefits "may be reduced by deductible sources of income," including SSDI benefits. *Id.* The court found that this provision also created an equitable lien: "[T]he Plan's overpayment provision asserts a right to recover from a specific fund distinct from Gilchrist's general assets – the fund being the overpayments themselves – and a particular share of that fund to which the plan was entitled – all overpayments due to the receipt of Social Security benefits, but not to exceed the amount of benefits paid." *Id.* at 46–47 (citing *Dillard's, Inc. v. Liberty Life Assurance Co.*, 456 F.3d 894, 901 (8th Cir. 2006)).

The language in the GFS Plan has a similar effect to that at issue in *Longaberger* and *Gilchrest*. The GFS Plan provides: "If the Plan pays benefits which should not have been paid by

the Plan, the Plan may recover the excess payments from the Participant, any provider, any persons to whom the payments were made, or any insurance company or other organization, in the Plan Administrator's discretion." GFS Plan § 15.10.

Like the plans in *Longaberger* and *Gilchrest*, the GFS Plan identifies a particular fund – excess benefit payments paid to a participant that should not have been paid – and the particular share of that fund – the amount of the excess payments. This language satisfies the requirements of *Sereboff*. The GFS Plan's counterclaim is a proper equitable action under § 1132(a)(3), and its motion for summary judgment on its counterclaim will be granted.[7]

## V. CONCLUSION

For the foregoing reasons, defendant GFS Division Voluntary Employee Benefit Plan's motion for judgment on the administrative record will be granted. Defendant GFS Division Voluntary Employee Benefit Plan's motion for summary judgment on its counterclaim will also be granted. Plaintiff John A. Mullins' cross-motions for judgment on the administrative record and summary judgment on the GFS Plan's counterclaim will be denied.

A separate order will issue in accordance with this opinion.

---

[7]Mullins claims that because he has exhausted the benefits he received from the GFS Plan and is receiving income only from SSDI benefits, the Plan's counterclaim is barred by 42 U.S.C. § 407(a). Under this statute, "[t]he right of any person to any future payment under [federal Social Security law] shall not be transferrable or assignable, at law or in equity, and none of the moneys paid or payable . . . shall be subject to execution, levy, attachment, garnishment, or other legal process . . . ." However, the GFS Plan does not seek a lien specifically on Mullins' future Social Security benefits. Therefore, 42 U.S.C. § 407(a) does not bar this action. *See Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 274 (6th Cir. 2010) (upholding the district court's finding that plan was entitled to equitable lien against claimant for overpaid benefits, but reversing order imposing lien specifically on claimant's future Social Security benefits).