UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


JOHN A. MULLINS                                                        PLAINTIFF


v.                                        CIVIL ACTION NO. 3:09-CV-00371-S


PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.              DEFENDANTS


## MEMORANDUM OPINION


This matter is before the court on cross-motions by defendant Prudential Insurance Company of America ("Prudential") and plaintiff John A. Mullins ("Mullins") for judgment on the administrative record (DNs 83 and 114). For the reasons set forth herein, both motions will be **DENIED** and Mullins' claims will be remanded to Prudential for consideration consistent with this opinion.


## BACKGROUND


Mullins brings this action against Prudential pursuant to the Employee Retirement Income Security Act of 1974, 28 U.S.C. § 1001 *et seq*. ("ERISA"). He claims that Prudential improperly denied his claim for long term-disability benefits.

From May 1993 to October 2005, Mullins worked at Gordon Food Service ("GFS") as a field sales representative. Mullins was based in eastern Kentucky, and served customers in Johnson, Floyd, and Pike Counties. Administrative Record (AR) at D0339. The job required "significant standing, walking and travel," *id.* at D1209, and Mullins has stated that he traveled approximately 150 miles per day. *Id.* at D0339. Because Mullins worked as a sales representative in a rural market, he sometimes took responsibility for delivering food items to

smaller businesses whose orders would have otherwise been too small to qualify for delivery. *Id.*

Thus, Mullins was required to engage in more carrying and lifting than sales representatives in

urban or suburban markets. *Id.* at D1209. Mullins would also occasionally deliver to customers

items that were out of stock at the time of their regularly scheduled deliveries. *Id.*

       As an employee of GFS, Mullins was a participant in two separate disability benefit

plans. The first was a plan self-funded by employers in the GFS family of companies and

administered by GFS. This plan (the "GFS Plan") provided Mullins with up to one year of

disability benefits. As a participant in the GFS Plan, Mullins was also eligible to purchase a

Voluntary Long-Term Disability Plan benefit, which provided benefits beyond the one-year cap

in the GFS Plan. Mullins elected to participate in this plan (the "Prudential Plan" or the "Plan"),

which was insured and administered by Prudential, and is the plan at issue in this case.

       The Prudential Plan uses two different standards to determine whether an individual is

"disabled" and therefore eligible for benefits. During the first 24 months a claimant seeks

payments, a claimant is considered "disabled" when Prudential determines that the claimant is

"unable to perform the material and substantial duties of [his] regular occupation due to . . .

sickness or injury," is under the regular care of a doctor, and has a 20% or greater loss in his

monthly earnings due to the sickness or injury. *Id.* at D1335. After 24 months, however, a

claimant is considered "disabled" only when Prudential determines that the claimant is "unable

to perform the duties of any gainful occupation for which [he is] reasonably fitted by education,

training or experience, and is under the regular care of a doctor. *Id.*

       Mullins has been diagnosed with a number of medical conditions, including diabetes

mellitus, obesity, hypertension, hyper-cholesterolemia, gastroesophegial reflux, and angina. *Id.*

at D01256. He has also previously had a myocardial infarction and a hernia repair. *Id.* Mullins also claims to suffer from severe back and neck pain as the result of problems with his lumbar and cervical spine. Mullins claims that the combination of his internal medical and orthopedic problems render him unable to work, but the majority of the record pertains to alleged impairments arising from his back and neck conditions.

Prudential's internal notes indicate that Mullins stopped working for GFS on October 5, 2005 because of cervical spondylosis.[1] *Id.* at D1180. A magnetic resonance imaging (MRI) exam taken on October 20, 2005 revealed that Mullins had a number of back and neck problems, including moderate to severe spondylosis, a possible disc bulge, and a central disc extrusion, all in his cervical spine. *Id.* at D0009–D0010. The MRI also showed a "cord signal abnormality" in Mullins' cervical spine that the reviewing physician stated likely represented chronic myeomalacia related to spinal stenosis.[2] *Id.* at D0012.

In early 2006, Mullins sought treatment from a pain specialist, Dr. Mangala Shetty. Shetty's notes indicate that Mullins was complaining of neck pain radiating to his right shoulder and arm, as well as pain from his right hip to his knee. *Id.* at D0006. Mullins also reported a shooting pain from his right shoulder and arm to his fingers. *Id.* After conducting an exam, Shetty concluded that Mullins showed evidence of radiculopathy on the right side of his cervical

---

[1]Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1780 (31st ed. 2007).

[2]Myeomalacia is "morbid softening of the spinal cord." DORLAND'S, *supra*, at 1238. Spinal stenosis is "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by enroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication. The condition may be either congenital or due to spinal degeneration." *Id.* at 1795.

spine, as well as radiculopathy on the right side of his lumbar spine. *Id.* at D0007. Shetty provided Mullins with a prescription for Darvocet N-100 and urged him to complete physical therapy. *Id.* at D0008.

Mullins attended physical therapy sessions at a facility called TLC Rehab from January to April 2006. During the initial evaluation, conducted by a physical therapist, Mullins tested positive for a number of "signs" used to assess orthopedic pain.[3] Although Mullins apparently attended physical therapy several times a week and made some progress in his range of motion, *see id.* at D0015, he nonetheless continued to report cervical and shoulder pain, as well as difficulty sleeping, dressing, driving, and lifting objects. *Id.* at D0017. Mullins also reported difficulty with sitting and standing for more than 15 minutes at a time, as well as decreased strength in his cervical spine and arms. *Id.* at D0017.

In August 2006, Mullins filed a claim with Prudential for long-term disability (LTD) benefits. *Id.* at D1323. On November 2, 2006, Prudential denied the claim, concluding that Mullins had not shown that he was unable to perform the material and substantial duties of his

---

[3]Specifically, Mullins tested positive for Spurling's sign, Faber's test in the right lower extremity, Scour's test in the right and left hip, and positive for a "jump" sign in his upper cervical and lumbar areas. Spurling's test is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000). A Faber test, also known as a Patrick test, is used to "determine the presence or absence of sacroiliac disease; with the patient supine, the hip and knee are flexed and the external malleolus is placed above the patella of the opposite leg; this can ordinarily be done without pain, but, on depressing the knee, pain is promptly elicited in sacroiliac disease." *Id.* Scour's test is used to assess pain and range of motion in the hip area. *See* Amy V. Cliborne, et al., *Clinical Hip Tests and a Functional Squat Test in Patients with Knee Osteoarthritis: Reliability, Prevalance of Positive Test Findings, and Short-Term Response to Hip Mobilization*, J. OF ORTHOPAEDIC & SPORTS PHYSICAL THERAPY, Nov. 2004 at 676, 678. A "jump sign" is "an involuntary reaction to stimulation of a tender area or trigger point" during a physical examination. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

job. *Id.* at D1313. Mullins filed his first appeal in December 2006. *Id.* at D1306. As part of its review of Mullins' claim, Prudential requested that Mullins attend an independent medical examination (IME) with Dr. Terry Troutt, an orthopedist.

Troutt examined Mullins on January 31, 2007. Troutt concluded that Mullins had some functional impairments, and stated that Mullins should not engage in "[r]epetitive over-the-shoulder work" or "repetitive lifting with the right upper extremity over the shoulder." *Id.* at D0948. Troutt also stated that Mullins should not lift any object that weighed more than 20 pounds or frequently carry anything that weighed more than 10 pounds. *Id.* Finally, Troutt stated that Mullins should not engage in repetitive rotation or extension of his cervical spine, but that Mullins did have the capacity for driving. *Id.* Troutt stated that these conclusions were supported by the findings of the October 2005 MRI. *Id.* at D0949. However, Troutt expressed concerns that Mullins was engaging in "symptom magnification" because Mullins was able to spontaneously turn his head without discomfort while pointing to an area of pain in his back. *Id.* Troutt also stated he believed Mullins might be exaggerating his symptoms because Mullins initially responded negatively to palpatation of his neck muscles, but did not have a similar response when the same muscles were palpated and Mullins was distracted. *Id.* Troutt concluded that "it is reasonable to expect that [Mullins] may have neck pain but may not be as severe as how he describes his condition upon presentation today and the contraindications with physical examination findings." *Id.* at D0950.

After Troutt's review, Prudential denied Mullins' appeal, concluding that although Mullins had some functional limitations, this did not keep him from performing the "light" work required of a food sales representative. *Id.* at D1298. Mullins filed a second appeal in August

2007, making a number of arguments, but specifically pointing out that because he was a sales representative in a rural area, his work qualified as a "medium duty" job rather than "light duty." *Id.* at D0046–48. Upon review, Prudential agreed, and granted Mullins' appeal on March 12, 2008. *Id.* at D1210–11.

In June 2008, Prudential sent a letter to Mullins explaining that in order to continue to receive disability benefits after October 2008, he would need to satisfy the more stringent "any occupation" standard set forth in the Plan documents. *Id.* at D1281. Prudential stated that it had performed an Employability Assessment to determine what occupations Mullins would qualify for based on his work restrictions, education, work experience, and training, and that it had found three positions that met its criteria. *Id.* Prudential stated that based on this information, it anticipated that Mullins would no longer be eligible to receive disability benefits, and asked him to provide within 30 days "all record [sic] of medical treatment that you have undergone since January 1, 2008." *Id.* at D1281. Mullins apparently did not provide any additional medical information, and on September 24, 2008, Prudential sent him a letter notifying him of its intent to terminate his benefits. *Id.* at D1277–79. In this letter, Prudential reiterated its conclusions from the June letter, and also notified Mullins that he had the right to appeal and provide medical evidence of his disability.

On January 23, 2009, Mullins filed an appeal. *Id.* at D0132–43. He claimed that he was unable to perform even sedentary work, and cited the following evidence in support:

• A letter from Dr. Frederic Huffnagle, an orthopedic surgeon, dated February 21, 2007. Huffnagle had, at Mullins' request, reviewed Mullins' medical file. Huffnagle had concluded that Mullins had "significant orthopedic problems" and concluded that he should be limited to lifting 15 pounds maximum and 10 pounds for up to one-third of an eight-hour workday; should not sit more than three hours in an eight-hour workday, and should have the option to sit or stand at 30-minute intervals; should not stand more than

three and one-half hours in an eight-hour workday, and should have the option to sit or stand at 30-minute intervals; should avoid vibrations; and should never climb, stoop, balance, keel, or crawl. *Id.* at D0002–D0003.

• A January 23, 2006 report from TLC Rehab, which noted that Mullins had difficulty with prolonged sitting and standing of more than 15 minutes. *Id.* at D0014.

• A "Long Term Disability Status Treating Physician Opinion" form, completed by Dr. Jose Roman, Mullins' general practitioner, in which Roman opined that Mullins was unable to work in a sedentary position. *Id.* at D0023.

• The July 20, 2007 determination of Administrative Law Judge James S. Quinlivan, who found that Mullins was "disabled" under the Social Security Act, and was therefore eligible to receive Social Security Disability Benefits. *Id.* at D0091–97. Quinlivan concluded that Mullins suffered from degenerative osteoarthritis, degenerative disc disease of the cervical and lumbar spine, obesity, and diabetes mellitus, all of which caused significant limitations in Mullins' ability to perform basic work. Quinlivan agreed with Huffnagle's assessments of the restrictions Mullins should have on standing, sitting, and moving during the workday. *Id.* at D0095.

• A July 31, 2008 letter from Roman certifying that Mullins remained under his care for multiple medical problems, including chronic low back pain, degenerative disc disease, noninsulin dependent diabetes mellitus, and hypertension. *Id.* at D0123.

• A November 21, 2008 "Physical Abilities and Limitations" opinion form, filled out by Dr. Roman, in which Roman noted that Mullins could only sit for two hours out of an eight-hour day, for up to 15 minutes at a time.

• A September 25, 2008 functional capacity evaluation from Ocala Rehabilitation Associates in which a physical therapist concluded that Mullins was not suited for stationary work that included sitting or standing activities because he "clearly demonstrated his intolerance to these activities" and that Mullins would not be safely able to perform or able to tolerate "any static or dynamic employment positions." *Id.* at D0131.

Mullins also pointed out that his pain was being treated with several prescription medications, which he claimed had "a significant adverse effect on his ability to physically and/or cognitively work in any occupation." *Id.* at D0139. Specifically, Mullins stated that he was taking Lortab (acetaminophen/hydrocodone), Voltaren, and Arthrotec. *Id.* at D0139–40.

On March 9, 2009, Dr. Leela Rangaswamy, an orthopedic surgeon employed by MES Solutions,[4] reviewed Mullins' medical records at Prudential's request. Rangaswamy's report noted the findings of Shetty, Troutt, and Huffnagle, and Roman's July 31 letter, as well as documentation of a November 2006 hospital visit Mullins made after complaining of chest pain. Rangaswamy concluded that Mullins "does not have functional impairments from October 5, 2008 forward or for any closed period of time since October 5, 2008." *Id.* at D0167. She stated that "[t]he submitted data does not identify the presence of any musculoskeletal impairment that would result in any functional difficulties. The claimant has age related degenerative cervical spondylosis without any neurological deficits that would be associated with any functional impairments." *Id.* Citing Troutt's IME from 2007, Rangaswamy concluded that Mullins' "self-reported symptoms are neither supported by nor consistent with the diagnostic testing and physical examination findings" and that "[t]he degree of pain and self reported limitations are not substantiated by the presence of clinical physical findings commensurate with any musculoskeletal dysfunction." *Id.* at D0168.

Dr. Albert Fuchs, another MES reviewer, reviewed Mullins' internal medicine medical records, also on March 9, 2009. *Id.* at D0153. Fuchs concluded that Mullins did not have any functional impairment from an internal medical perspective, *Id.* at D0159, finding that Mullins' diabetes was not documented to be causing any symptoms because no symptoms of hyper or hypoglycemia were documented, because his hypertension and hypercholesterolemia were not symptomatic, and because his gastroesophogeal reflux was not causing any documented functional impairments. *Id.*

---

[4]It appears from the record that MES Solutions is in the business of providing independent medical records review services.

On March 31, 2009, Prudential denied Mullins' appeal. It noted that, in Mullins' appeal letter, he had cited the conclusions of Huffnagle, TLC Rehab, and Roman. Prudential noted the findings of the MRI, Shetty, and Huffnagle, as well as Roman's letter from July 31, 2008. The letter also provided extensive summaries of Rangaswamy's and Fuchs' independent file reviews. Prudential stated that "both external reviewing physicians concluded there are no medically supported restrictions or limitations in your client's functioning." *Id.* at D1260. Prudential concluded that "[i]n the absence of medically supported restrictions or limitations in Mr. Mullins' functioning, we have further determined he retains the functional capacity to perform his regular occupation as it is normally performed. Additionally, we maintain Mr. Mullins possesses the education, training, experience and functional capacity to perform . . . alternate occupations." *Id.* at D1261. Prudential "acknowledge[d]" that Mullins had been approved for Social Security benefits, but did not specifically address the Administrative Law Judge's findings, noting only that "the approval of one type of benefit does not mean that another type of disability benefit will be approved." *Id.*

## ANALYSIS

Section 1132 of Title 29 of the United States Code allows a civil action to be brought by a participant or beneficiary to recover benefits due to him under the terms of an ERISA plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).

When reviewing an ERISA plan administrator's denial of benefits, courts in the Sixth Circuit follow the procedures set forth in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). As the court recognized in *Wilkins*, a court reviews a plan administrator's

denial of benefits *de novo*, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 613 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Where the plan administrator has such discretion, the administrator's decision is reviewed under a "highly deferential arbitrary and capricious standard." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Regardless of the applicable standard, the reviewing court may only consider the record that was presented to the plan administrator. *See Wilkins*, 150 F.3d at 619.

## I. Standard of Review

In order to warrant arbitrary and capricious review, a plan's grant of discretionary authority must be "express." *Yeager*, 88 F.3d at 380. In *Yeager*, the Sixth Circuit Court of Appeals found an "express" grant of discretion when a plan required that a claimant submit "satisfactory proof of total disability" to the plan administrator. *Id.* at 381. The Court of Appeals has also found express grants of authority where the plan stated that disability would be determined "on the basis of medical evidence satisfactory to the Insurance Company," *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991), and where the plan stated that benefits would be granted only "when Prudential determines that all . . . conditions are met." *Noland v. Prudential Ins. Co. of Am.*, 187 Fed. App'x 447, 452 (6th Cir. 2006).

Here, the Plan states that disability benefits begin when "Prudential determines" the criteria for disability have been satisfied, and stop on "the date the participant fails to submit proof of continuing disability satisfactory to Prudential." D1335. This language, which is almost identical to that recognized in *Noland* as granting discretionary authority and similar to that used

in *Yeager* and *Miller*, is sufficient to constitute an "express" grant of discretionary authority to the plan administrator.[5]

Mullins does not offer any real attack on the policy language, other than describing it as "ambiguous," DN 112 at 28, a characterization this court rejects.[6] He does, however, argue that any purported grant of discretionary authority contained in the Plan documents is invalid because it does not comply with administrative rules, promulgated in the state of Michigan, "which generally prohibit insurers and nonprofit health-care corporations from issuing, advertising, or delivering to any person in Michigan, a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause and provide that any such clause is void and of no effect." *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 602 (6th Cir. 2009). Mullins claims that the Plan is governed by Michigan law because it was issued to Gordon Food Services, which is headquartered in Michigan, and the Plan documents identify the governing jurisdiction as the state of Michigan. Prudential, however, claims (without citation to authority) that "Michigan State [sic] law is completely irrelevant" because "[t]his court's jurisdiction arises under ERISA, [the claim] is brought by a claimant living in Kentucky, and [the claim] necessarily is to be adjudicated in accord with applicable ERISA jurisprudence in this District and Circuit." DN 119 at 4.

---

[5]Prudential bolsters its argument in favor of discretionary authority by pointing to provisions in the Summary Plan Description and the GFS Plan documents that it claims also grant the plan administrator discretionary authority. Because we have found the language in the Plan document itself sufficient, we need not consider these arguments.

[6]Mullins also notes that Michigan courts have held that language similar to that in the Prudential Plan is not sufficient under Michigan law to constitute a grant of discretionary authority. Because this matter presents a question of federal law and is brought in federal court, we are bound to follow the precedent of the Sixth Circuit Court of Appeals, not the state of Michigan. Therefore, these cases do not bear on our decision in this case.

We need not resolve this issue at this time because, as Prudential points out, the Michigan ban on discretionary clauses does not apply to "a contract document in use" before July 1, 2007 that was not revised on or after that date. *See* MICH. ADMIN. CODE r. 500.2202(b); *Ross*, 558 F.3d at 603. The policy under which Mullins filed his claim is dated January 1, 2005, and Mullins' claimed date of disability is October 5, 2005. Mullins does not argue, nor does he present any evidence, that his contract document was revised at any point. Thus, any discretionary language in the Plan documents is valid notwithstanding the Michigan ban. *See Morrison v. Unum Life Ins. Co. of Am.*, 730 F. Supp. 2d 699, 706 (E.D. Mich. 2010) (Finding that "[t]he rights of the parties to this action should be determined by the state of the law at the time of the event triggering the entitlement to benefits," and holding that the discretionary clause ban did not apply to a life insurance policy whose purchaser had died ten months before the ban took effect).[7]

---

[7]Mullins notes that the Prudential policy's own language requires it to conform to the requirements of state and federal law:

> If the provisions of the Group Contract do not conform to the requirements of any state or federal law or regulation that applies to the Group Contract, the Group Contract is automatically changed to conform with Prudential's interpretation of the requirements of that law or regulation.

D1371.

Mullins argues that this provision means that the policy issued to him must be altered to conform to Michigan's discretionary clause ban. However, the policy provision states only that the contract will be altered to conform to requirements that apply to it. Because, as we have explained, the Michigan rules are not retroactive, they do not apply to Mullins' policy, and the policy therefore need not change its terms to follow them. Furthermore, Mullins makes the specious argument that because a Michigan state court has found that the use of language similar to that in the Plan is not sufficient to vest an insurer with discretionary authority, use of this language is prohibited by Michigan law. The court rejects this claim.

Mullins also argues that Prudential is estopped from arguing that the plan issued to Mullins contains a discretionary clause because Prudential certified to the Michigan Office of Financial and Insurance Regulation (OFIR) that Prudential [did] not have any policy forms in effect in the State of Michigan containing discretionary clauses as defined in the Michigan Administrative Code." DN 112-4. He argues that "Prudential is bound to abide by Michigan's regulatory authority – including its certification that none of its policies contain discretionary clauses." DN 112 at 30. However, he cites no authority to support this proposition, nor does the court find its logic convincing. First, it is not clear that Prudential's certification even pertains to Mullins' policy, since, as we have explained, the Michigan regulations do not apply retroactively. Moreover, even if Prudential did intend to represent that this policy did not have a discretionary clause, Mullins has presented no authority supporting the proposition that Prudential is legally bound by its assertion to the OFIR. Thus, the court concludes that the Michigan rules – and Prudential's representations with respect to them – are not relevant to our analysis of the standard of review. Accordingly, this court concludes that the proper standard of review in this matter is the "arbitrary and capricious" standard.[8]

## II. Review of Prudential's Decision

The arbitrary and capricious standard of review is "the least demanding form of judicial review of administrative action." *Perry v. United Food and Commercial Workers Dist. Unions*

---

[8]Mullins asserts that even if the Plan is, as Prudential argues, subject to Kentucky law, Kentucky, like Michigan, disapproves of discretionary clauses. Mullins correctly notes that Kentucky Department of Insurance has issued an Advisory Opinion stating that, in the Department's view, "discretionary clauses deceptively affect the risk purported to be assumed in any policy and as such, any forms containing discretionary clauses may be disapproved." *See* DN 124-2 (Department of Insurance Advisory Opinion). However, Kentucky, unlike Michigan, has not expressly banned the use of discretionary clauses. We thus reject any attempt by Mullins to argue that Kentucky law invalidates the Plan's discretionary clause.

*405 & 442*, 64 F.3d 238, 242 (6th Cir. 1995). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* The benefit determination of a plan administrator should be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). However, although the arbitrary and capricious standard is deferential, "it is not . . . without some teeth." *Evans v UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (internal quotations omitted)), and district courts "are not to serve as mere rubber stamps for the decisions of plan administrators." *Id.* A review of the administrative record for an arbitrary and capricious decision "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue." *Id.*

When evaluating a plan administrator's decision under the arbitrary and capricious standard, a court must consider a number of factors, including whether there existed a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review instead of conducting a physical examination of the applicant. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552–53 (6th Cir. 2008) (citations and quotations omitted).

**A. Prudential's Assessment of Mullins' Evidence**

Mullins claims that Prudential's review of his medical records was flawed because it arbitrarily rejected three key pieces of evidence tending to show Mullins' disability: Dr. Roman's November 21, 2008 "Physical Abilities and Limitations" form; the September 25, 2008

functional capacity evaluation from Ocala Rehabilitation Associates; and the determination of Judge Quinlivan that Mullins was eligible for Social Security Disability Insurance (SSDI) benefits.

ERISA requires that employee benefit plans "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). Moreover, plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id.* § 1133(2).

In the ERISA context, plan administrators are not required to "automatically . . . accord special weight to the opinions of a claimant's physician," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Courts also may not "impose on plan administrators a discrete burden of explanation when [the administrators] credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* However, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* A plan administrator may not simply summarily reject the opinions of a treating physician, but must instead "give reasons for adopting an alternative opinion." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006).

Here, Prudential summarily rejected two pieces of medical evidence that directly contradicted its finding that Mullins was not totally disabled. Neither Dr. Rangaswamy's medical review nor Prudential's March 31, 2009 denial letter discussed Dr. Roman's November 2008 conclusion that Mullins was unable to sit for more than two hours in a workday (rendering him

unfit for sedentary work) or the Ocala Rehabilitation Associates report stating that Mullins was unable to engage in sedentary occupations. It is unclear why Prudential rejected these opinions because they are not acknowledged in its claim denial letter or in Dr. Rangaswamay's report. Of course, Prudential would have been well within its rights to accept the opinions of Dr. Rangaswamy over those of Mullins' medical providers if Prudential had a reason for doing so, *see Nord, supra*, but its failure to even mention[9] these two pieces of evidence weighs in favor of a finding of arbitrary and capricious review.

Prudential argues that these reports were duly considered because they were submitted to Dr. Rangaswamy as part of the documents to be reviewed. It also argues that requiring Dr. Rangaswamy to make explicit her reasons for disagreeing with Mullins' treating physicians would be "elevating picayune form over substance." *See* DN 119 at 16. And Prudential reiterates that it has no discrete burden of explanation imposed upon it when it rejects a treating physician's opinion. Prudential's arguments are unavailing. The mere statement that these reports were submitted to Dr. Rangaswamy does not show that they were considered as part of the claims assessment process, nor does this assertion establish that Prudential's decision to reject them was the result of a "deliberate, principled reasoning process." *Baker*, 929 F.2d at 1144. Moreover, Sixth Circuit caselaw is clear that while Prudential does not have a separate burden of explanation with respect to treating physician opinions, it nonetheless may not simply reject out of hand the opinions of a claimant's medical providers without providing any explanation.

---

[9]We do note that Dr. Rangaswamy's report lists the November 2008 Roman report and the Ocala Rehabilitation report as part of a long list of documents reviewed. *See* AR at D0166. Prudential's denial letter does this as well. *Id.* at D1256. However, neither Dr. Rangaswamy nor Prudential mentions either report beyond the initial list.

Because it is unclear why Prudential rejected the opinions of Dr. Roman and Ocala Rehabilitation regarding Mullins' disability, or, alternatively, whether it considered them at all in its review process, we conclude that this fact weighs in favor of a finding of arbitrary and capricious review.

Prudential's treatment of Judge Quinlivan's SSDI determination also raises questions about the reasoning underlying its review process. A Social Security Administration finding of disability does not bind a plan administrator, but such a finding is "far from meaningless." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). Further, when a plan administrator encourages an applicant to apply for Social Security disability payments, financially benefits from the applicant's receipt of those benefits, and then fails to explain why it disagrees with the Social Security Administration's assessment of disability, the reviewing court should weigh this finding in favor of a conclusion that the decision was arbitrary or capricious. *Bennett*, 514 F.3d at 554.

Mullins claims that he applied for Social Security disability benefits "at Prudential's behest." DN 112 at 7. However, he cites no evidence in the administrative record to support this assertion. Nonetheless, it is clear from the record that Prudential benefitted from Mullins' receipt of such benefits because it was entitled to offset its payment of benefits to Mullins by the amount of his Social Security payments. AR at D0975. Accordingly, it should have given the determination "appropriate weight." *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006).

In its March 31 denial letter, Prudential failed to offer any explanation as to why it disagreed with Judge Quinlivan's disability determination. Although Prudential acknowledged

that Mullins had been approved for Social Security benefits and asserted that it had taken this fact "into consideration," it nonetheless discounted the finding, stating:

> [T]he Social Security Administration (SSA) must make their determinations based on the information available to them and their rules and guidelines, and we must render our decisions based on the information available in the LTD file and the provisions of the LTD policy.

AR at D1261.

Prudential claims that this statement is "indisputable evidence" that Prudential considered the Social Security determination. DN 119 at 21. However, "mere mention of the [Social Security] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett*, 514 F.3d at 553 n.2. Prudential offered no explanation as to how or why its findings differed from those of the Social Security Administration, or any description of the extent to which it took the SSA findings into consideration. While, as with the treating physician opinions, Prudential was not bound to follow the Social Security determination, Prudential nonetheless was not entitled to summarily reject it, and was obligated to provide a reasoned basis for its opinions. Accordingly, Prudential's treatment of the SSA determination weighs in favor of a finding of arbitrary and capricious decision-making.

**B. Prudential's Potential Conflict of Interest**

Where a plan administrator is both the decision-maker with respect to claims eligibility and the payor of those claims, a court should take this potential conflict of interest into account when assessing whether the administrator's decision was arbitrary and capricious. *Calvert*, 409 F.3d at 292.

Here, it is undisputed that Prudential is both the decision-maker and the party responsible for paying Mullins' claims. Prudential based its denial of Mullins' benefits primarily on the medical records reviews conducted by Doctors Rangaswamy and Fuchs, who were hired by Prudential to review Mullins' file. "As the payor of claims, [Prudential] had a clear incentive to contract with individuals who were inclined to find in its favor that [Mullins] was not entitled to continued LTD benefits." *Id.* Although we have found no direct evidence in the record that Prudential's potential conflict of interest tainted its decision-making process with respect to Mullins' claim, "the potential for self-interested decision-making is evident" in such a situation. *Id.* (quoting *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000)). Thus, we must also consider this factor as weighing in favor of a finding of arbitrary and capricious decision-making.

### C. Prudential's File Review

Mullins also argues that Prudential's decision-making process was flawed because Prudential relied solely on a review of Mullins' medical file when making its benefits determination. Mullins argues that Prudential had the right and ability to require Mullins to undergo a physical examination, but did not do so.

A plan administrator's reliance on a "file review," standing alone, does not render a benefits decision arbitrary and capricious. *Calvert*, 409 F.3d at 295. However, "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* This is especially true where "conclusions from [the] review include

critical credibility determinations regarding a claimant's medical history and symptomology." *Id.* at 297 n.6.

The Prudential Plan explicitly reserved the right to require Mullins to undergo a physical examination by the doctors of Prudential's choice. AR at D0065. In fact, Prudential had done so once before when it ordered Dr. Troutt's independent medical examination. Thus, while Prudential was permitted to rely on a file review if it chose, it nonetheless had the ability to order an in-person exam.

Prudential's reliance on a file review in this instance is troubling because Mullins' symptoms – and thus his level of disability – are largely subjective. The heart of Mullins' claim is that he is unable to work due to pain in his back and neck. Although problems with his spine were objectively shown in the 2005 MRI, the extent of the disability they cause is difficult to quantify. Thus, any determination of Mullins' level of disability required Prudential to judge Mullins' credibility. Dr. Troutt had made one such judgment in his 2007 examination, concluding that Mullins may have been exaggerating his pain; however, Mullins' own medical providers and the Social Security Administrative Law Judge apparently found his complaints believable. Prudential's decision to rely solely on a file review when faced with this conflicting evidence also lends weight to Mullins' argument that he did not receive a full and fair review of his claim. *See Calvert, supra.*

**D. Conclusion**

In deciding Mullins' claim, Prudential, without explanation, rejected the opinions of two medical providers who had examined Mullins in the latter part of 2008. Instead, it relied primarily on the conclusions of Dr. Rangaswamy, a file reviewer, who in turn relied heavily on

Dr. Troutt's early 2007 independent medical examination. Prudential also rejected the disability determination of the Social Security Administrative Law Judge without any substantive discussion of why it did so. Moreover, Prudential relied solely on a file review when assessing symptoms that were largely subjective and therefore necessarily required a credibility determination. Finally, Prudential was operating under a potential conflict of interest that, although there was no overt evidence of impropriety, is nonetheless a consideration in our assessment of the review process. Taking all of these facts into account, the court concludes that the record does not show that Prudential's denial of Mullins' benefits was the result of "a deliberate, principled reasoning process." *Baker*, 929 F.2d at 1144. Thus, Prudential's decision does not survive this court's arbitrary and capricious review, and its motion for judgment on the administrative record will be denied.

### III. Mullins' Motion for Judgment on the Administrative Record

While we have concluded that Prudential's claims decision process was flawed, we are not satisfied from the record that Mullins is entitled to disability benefits under the terms of the Prudential Plan. The opinions of Prudential's physicians differ signifcantly from those of Mullins' physicians, and even Mullins' own medical providers have not been in complete agreement as to the extent of Mullins' physical limitations or the degree to which he might able to work. In such a situation, the proper remedy is to remand the case to the claims administrator for a full and fair review. *See Helfman v. GE Grp. Life Ins. Co.*, 573 F.3d 383, 396 (6th Cir. 2009). We will do so here. Mullins' motion for judgment on the administrative record will be denied.

A separate order will issue in accordance with this opinion.